## 21060

The STATE, Respondent, v. Larry GILBERT and J. D. Gleaton, Appellants.

(258 S. E. (2d) 890)

*Robert W. Mance, III,* Columbia, *for appellants.*

*Atty. Gen. Daniel R. McLeod* and *Asst. Atty. Gen. Brian P. Gibbes,* Columbia and *Sol. Donald V. Myers,* Lexington, *for respondent.*

October 2, 1979.

NESS, Justice.

This appeal is from the murder conviction and death sentence of appellants Larry Gilbert and J. D. Gleaton. We affirm the convictions, set aside the death sentences, and remand for a re-sentencing proceeding.

In the early afternoon of July 12, 1977, Ralph Stoudemire was shot and stabbed to death at his South Congaree service station in Lexington County. Approximately $200.00 was stolen. Witnesses saw two black men hurriedly leave the station in a blue 1978 Continental Mark IV with a white top and cast aluminum ET Mag wheels.[1] The car reportedly had a low hanging tail pipe which emitted bluish gray smoke. One witness provided the investigating officers with license number KVH377. A nearby service station employee testified the car had "rust bubbles" on it, an Aiken dealer tag on bumper, and Goodyear double eagle, steel belted radial tires. Numerous other witnesses placed two black men fitting appellants' descriptions[2] in a car conforming to the above description in the South Congaree area during the earlier part of the day. The victim's son arrived on the scene shortly after the crime, and testified at trial his father stated two· black men had robbed, shot and stabbed him.

On July 13, 1977, South Carolina Highway Patrolman Harold Potter stopped a blue Lincoln with a white top bearing license number VKH377 occupied by four black males on Highway No. 21 in Aiken County, some thirty miles from the scene of the crime. Deputies from the Aiken County

Sheriff's Department arrived, and requested the occupants

[1] Several witnesses described the car as having "wire" or "spoke" wheels unusual for that type of car.

[2] The passenger was described as a black male about six feet tall, weighing 145-155 pounds and wearing a white shirt, white hat and dark trousers.

The driver was described as a black male about 5' 7", weighing 165-175 pounds with a goatee or beard and wearing a brown or green tank shirt, hat and dark trousers.

of the Lincoln to accompany them to their headquarters in Aiken. They readily agreed and followed the officers in their vehicle. The chief investigating officer, Richard Byers, subsequently arrested appellants and transported them to Lexington County where they confessed. A brown tank top shirt was found in the automobile, which was searched with the owner Gilbert's consent.

Initially, appellants contend Officer Potter lacked probable cause to make the stop and the subsequent confessions and evidence seized should have been excluded as fruits of an illgal arrest. We disagree.

The officer who made the initial stop was acting on an all points bulletin which described the vehicle as a Lincoln Continental with a blue bottom and a white top, occupied by two black males.[3] While it is true he did not have personal knowledge of the entire description then available, we believe Officer Potter had sufficient information to stop this distinctive vehicle. "It is recognized that the police may briefly detain and question a person upon a reasonable suspicion, short of probable cause for arrest, that he is involved in criminal activity." *State v. Foster,* 269 S. C. 373, 378, 237 S. E. (2d) 589, 591 (1977), citing *Terry v. Ohio,* 392 U. S. 1, 88 S. Ct. 1868, 20 L. Ed. (2d) 889 (1968) ; *Sibron v. N. Y.,* 392 U. S. 40, 88 S. Ct. 1889, 20 L. Ed. (2d) 917 (1968) ; *Adams v. Williams,* 407 U. S. 143, 92 S. Ct. 1921, 32 L. Ed. (2d) 612 (1972). We conclude Officer Potter had an "articulable and reasonable suspicion" to stop and investigate the vehicle. See *Delaware v. Prouse,* . . . U. S. . . ., 99 St. Ct. 1391, 59 L. Ed. (2d) 660 (1979).

Appellants next assert their confessions were improperly admitted into evidence because they were procured involuntarily through coercion and denial of counsel. Appellants

---

[3] In addition to the evidence already discussed, Larry Gilbert's employer had notified the investigating officers that Gilbert owned a vehicle fitting the proper description and that he had failed to report for work on the day of the crime.

concede they were advised of their constitutional rights pursuant to *Miranda v. Arizona,* 384 U. S. 436, 86 S. Ct. 1602, 16 L. Ed. (2d) 694 (1966), and signed waiver forms.

They were questioned briefly on the evening of their arrest and again the following day, without making any inculpatory statements. Subsequently, however, appellants were interviewed by a black investigator, and both gave confessions, and then were taken before a magistrate and a warrant was issued.

Appellants argue their confessions were inadmissible because they were held in custody for twenty-seven hours before being taken to a magistrate. We do not believe this delay amounted to coercion. As stated in *State v. Funchess,* 255 S. C. 385, 390, 179 S. E. (2d) 25, 27 (1971):

"We have held that a confession made while the accused is in the custody of an officer before any warrant for his arrest has been issued does not render it inadmissible. *State v. Brown,* 212 S. C. 237, 47 S. E. (2d) 521. However, the conduct of the officers obtaining the confession will be rigidly scrutinized and the fact that it is made while the accused is under arrest is a circumstance to be taken into consideration in determining whether the confession was freely and voluntarily given. *State v. Cain,* 246 S. C. 536, 144 S. E. (2d) 905."

We hold the twenty-seven hour period during which they were held in custody before appearing before a magistrate is not an unreasonable length of time under the circumstances of this case.[4] See *State v. Swilling,* 249 S. C. 541, 155 S. E. (2d) 607 (1967).

Appellants apparently contend that a black officer was purposely used by law enforcement authorities to interrogate them in order to gain their confidence. We

---

[4] This case is easily distinguishable from *Dunaway v. New York,* — U. S. —, 99 S. Ct. 2248, 60 L. Ed. (2d) 824 (1979), where police interrogated a subject taken into custody without probable cause for arrest.

fail to read any sinister purpose or prejudicial result into this procedure. We agree with the trial court and the jury that the confessions were voluntary.

We next consider an issue not raised in appellants' brief, but which, because of the imposition of the death sentence, we review under the doctrine of *in favorem vitae.*

Immediately prior to the offering of defense testimony, the trial judge fully and properly advised each appellant of his constitutional option of testifying or not testifying in the case. Each indicated his desire to testify. In the course of these instructions, counsel for the appellants [5] stated to the court that he had advised his clients that if they took the witness stand they would have the right to refuse to answer any question that would incriminate them. The trial judge acquiesced in this interpretation of the law by defense counsel and ruled the appellants could take the witness stand subject to their right to invoke the constitutional and statutory right of refusing to answer any question that might incriminate them.

The Fifth Amendment provides that no person shall be compelled in a criminal case to be a witness against himself. It is manifest that a necessary element of compulsory self-incrimination is some degree of coercion. See *Hoffa v. United States,* 385 U. S. 293, 87 S. Ct. 408, 17 L. Ed. (2d) 374, *reh. den.* 386 U. S. 940, 87 S. Ct. 970, 17 L. Ed. (2d) 880 (1966).

The privilege not to give self-incriminating evidence may be waived by anyone entitled to invoke it. Annotation, 38 A. L. R. (2d) 255, § 10. The right of an accused not to testify also comes within the protection of the Fifth Amendment. However, when an accused takes the stand in his own behalf, he waives his privilege against compulsory self-incrimination and must answer all proper questions. *Brown v. U. S.,* 356 U. S. 148, 78 S. Ct. 622, 2

---

[5] Both appellants were represented by the same attorney.

L. Ed. (2d) 589, *reh. den.* 356 U. S. 948, 78 S. Ct. 776, 2 L. Ed. (2d) 822 (1958); *Taylor v. State,* 258 S. C. 369, 188 S. E. (2d) 850 (1972); 8 Wigmore, Evidence, § 2276.

The appellants were never compelled to testify against themselves; rather they elected to testify after being fully advised by the trial judge of their right not to take the stand. As stated in *U. S. v. Washington,* 431 U. S. 181, 187, 97 S. Ct. 1814, 1819, 52 L. Ed. (2d) 238, 245 (1977), "absent some officially coerced self-accusation, the Fifth Amendment privilege is not violated . . ." There is no language in the Fifth Amendment which gives support to a device such as that employed by appellants to cripple law enforcement. While our Constitution provides procedural safeguards to protect defendants from arbitrary convictions, it makes no promise to stultify justice by erecting barriers to voluntary testimony given by a defendant, who, with benefit of counsel, chooses to take the witness stand.

■ We hold that by voluntarily taking the stand, appellants waived their right to Fifth Amendment protection. By acquiescing in their decision to invoke the self-incrimination privilege, the trial court accorded appellants greater protection than they were entitled to enjoy. If appellants had answered each of the proper questions propounded, as they should have been required to do after waiving their Fifth Amendment privilege, they would have suffered far greater prejudice. We are unpersuaded the invocation of the Fifth Amendment privilege by appellants, albeit improper, worked any greater prejudice to them than would have resulted had they exercised their right not to testify or had they been required to answer all proper questions.

■ When an accused elects to take the stand in his own behalf, it is always possible he may somehow prejudice himself in the eyes of the jury. It is equally possible that a decision not to testify may operate to prejudice an accused, despite admonitions by the trial court that

no adverse inference should be drawn therefrom. Each accused, with the assistance of counsel, makes this decision as a part of his trial strategy. Under the first principle of ethics and justice, a defendant who secures a ruling of the court, albeit erroneous, should not be permitted to profit, *in favorem vitae* or otherwise, from the court's assent to an improper trial strategy.

Accordingly, we hold appellants were not prejudiced by this procedure. We conclude no error was committed during the guilt stage of the bifurcated proceeding; therefore, we affirm appellants' convictions.

Upon the jury's verdict of guilty, the trial court conducted a separate sentencing proceeding to determine whether appellants should be sentenced to death or life imprisonment. Code § 16-3-20, Cum. Supp. 1978. This Court has automatic review whenever the death sentence is imposed. Code § 16-3-25, Cum. Supp. 1978.

While this argument has not been raised by appellants, we conclude their sentences must be vacated due to improper closing argument by the solicitor. The solicitor made the following remarks to the jury:

"But we couldn't stop there, because it doesn't stop with your decision, because after you decide what sentence should be, then that will be reviewed. That will be reviewed by the judge, we had to consider that. He will determine again all the legal issues and he will determine if you return a verdict of capital punishment if the facts in the case warrant wuch (sic) a sentence, and then it doesn't stop with him. It automatically goes on to our South Carolina Supreme Court, the five highest Judges in the state. They will have to review it and we had to consider that. They will have to go over everything that has happened since Monday, the law, the facts, and the sentence, to review it. And make their determination. It doesn't stop there. Then it can go on to the United States Supreme Court, the nine highest Judges in the land, for their review. They will review what all has

happened here, they will review what the judge did here, what the South Carolina Supreme Court did and all these things we had to take into consideration and lastly we took into consideration Ralph Stoudemire. So this is not something lightly. It doesn't stop at this phase of the trial. It will proceed on." (Tr. p. 912).

These comments by the solicitor suggested to the jury that its responsibility for deciding appellants' fate was lessened. Under our judicial system, the jury is given the heavy responsibility of determining whether a convicted murderer will live or die. It was erroneous and extremely prejudicial for the solicitor to imply to the jury that its burden could be passed on to a higher court. *State v. Rudolph Tyner*, S. C., 258 S. E. (2d) 559, Smith's Advance Sheets, August 25, 1979, Op. No. 21040; *Prevatte v. State*, 233 Ga. 929, 214 S. E. (2d) 365 (1975); *Fleming v. State*, 240 Ga. 142, 240 S. E. (2d) 37 (1977); *Hawes v. State*, 240 Ga. 327, 240 S. E. (2d) 833 (1977). See also 75 Am. Jur. (2d), Trial, § 230, p. 309.

Accordingly, we set aside appellant's death sentences, and remand the case for a re-sentencing proceeding conducted pursuant to Code § 16-3-25(E)(2), Cum. Supp. 1978.

Affirmed in part; vacated and remanded.

GREGORY, J., and JOSEPH R. MOSS, Acting Associate Justice, concur.

RHODES, J., and LEWIS, C. J., dissent.

The problem is further accentuated in that it deprived each defendant of the fundamental right to the full cross-examination of his codefendant. *State v. Smith*, 230 S. C. 164, 94 S. E. (2d) 886 (1956); *State v. McNinch*, 12 S. C. 89 (1879). The evidentiary areas in which the fifth amendment was invoked on cross-examination were crucial to the question of guilt or innocence. Under the ruling of the trial judge, the codefendant would have been foreclosed of the

right to cross-examine the defendant-witness in those critical areas.

There is yet another problem stemming from the fifth amendment ruling of the trial judge. Initially, the confession of each appellant was edited of any reference to the other appellant prior to being introduced; however, after both appellants took the stand, the trial judge allowed the original unedited versions, each of which implicated the other appellant, to be substituted for the edited versions. Normally, this procedure would have met the requirements of *Bruton v. U. S.* 391 U. S. 123, 88 S. Ct. 1620, 20 L. Ed. (2d) 476 (1968) for the reason that the authors of the confessions have taken the stand and are available for cross-examination by the codefendant. However, in this case the only cross-examination available to a codefendant was radically restricted as above set forth. Cross-examination on the contents of the confessions was not available because each appellant consistently invoked the fifth amendment when examined in this area.

This Court has expressed on numerous occasions its liberal policy of appellate review when the death sentence is involved. The case of *State v. Sharpe,* 239 S. C. 258, 274-75, 122 S. E. (2d) 622, 630 (1961) clearly states this policy, from which I quote:

The power of the law to take the life of human beings for a violation thereof is one which should be and is exercised with extreme caution. The frailties of human nature are so manifest and manifold until the law should and does place around the defendant, whose life would be taken for a violation of the law, every safeguard to enable such defendant to secure a fair and impartial trial. When it is made to appear that anything has occurred which may have improperly influenced the action of the jury, the accused should be granted a new trial, although he may appear to be ever so guilty, because it may be said that his guilt has not been ascertained in the manner prescribed by law.

It is my judgment that the erroneous procedure described above was such as to prejudice the rights of appellants and to deny them a fair trial, despite the worthy motives of the able trial judge.

I would reverse the case in its entirety and remand for a new trial.

LEWIS, C. J., concurs.

RHODES, Justice (dissenting).

I dissent and would reverse and remand for a new trial. The majority opinion does not, in my judgment, accord sufficient weight to the pervasive, prejudicial factors set in motion by the erroneous ruling of the trial judge granting fifth amendment immunity to the appellants while voluntarily testifying as witnesses in their defense.

As the majority recognizes, the trial judge erred in according the appellants protection against self-incrimination despite the fact that they had voluntarily taken the witness stand. Although the error was initiated by counsel for the appellants and was an attempt by the trial judge to safeguard constitutional rights, the effects of such error on this capital trial cannot be minimized for such reasons, but must be assessed by the standard of whether prejudice resulted.

In the course of their testimony, the appellants invoked the fifth amendment to all questions relative to the events surrounding the homicide. They answered only questions concerning events occurring after they were taken into custody and their testimony was primarily related to the issues of voluntariness of their confessions and the contended illegality of their arrests. The record reflects that the appellants invoked the fifth amendment 65 times during the course of their testimony. It is to be noted that this response became so mechanical that the fifth amendment was even invoked on occasion by appellants to questions asked by their own counsel. The following excerpt from appellant Gilbert's testimony

is typical of the subject matter of the questions to which the right was invoked:

"Q. Is it not a fact that the two of you were together on Tuesday?

"A. I refuse to answer that, Your Honor, on the grounds it might incriminate me.

"Q. Mr. Gilbert, is it not true that you and J. D. Gleaton went to the Soc station in South Congaree to rob the man?

"A. I refuse to answer that on the grounds it might tend to incriminate me.

"Q. Isn't it true that Mr. Gleaton went inside?

"A. I refuse to answer that, Your Honor, on the grounds it might tend to incriminate me.

"Q. Is it not true that J. D. Gleaton went in and stabbed the man?

"A. I refuse to answer that, Your Honor, on the grounds it might tend to incriminate me.

"Q. Is it not true that you thereafter went in and shot him?

"A. I refuse to answer that, Your Honor, on the grounds it might tend to incriminate me.

"Q. Did you not try to get in the cash register?

"A. I refuse to answer that, Your Honor, on the grounds it might tend to incriminate me."

My first concern is with the impact which this unusual if not unprecedented procedure had upon the jury. I do not feel that the situation here presented can be properly equated to that in which a defendant simply exercises the constitutional right not to take the witness stand. In the latter case, there is only the negative act of not testifying involved. Here, however, the jury is confronted with the affirmative acts of the defendants in taking the witness stand but refusing to answer any questions that were directed to them concerning their guilt or innocence, even though their right to life de-

pended on the outcome of the trial. The physical confrontation of the jury and the defendants present in this case is totally lacking where the defendant simply declines to take the stand. The courtroom atmosphere created by such procedure is incompatible with the very nature of an adversary trial. The refusal to answer the crucial questions asked would strongly imply guilt to a jury. The jury heard these refusals 65 times from the mouths of the appellants. It is illogical to conclude other than that the jury was substantially influenced against the appellants by reason of the procedure here followed.