THE STATE OF OHIO, APPELLEE, *v.* WILLIAMS, APPELLANT.

[Cite as State *v.* Williams (1986), 23 Ohio St. 3d 16.]

(No. 85-7—Decided March 26, 1986.)

*John T. Corrigan,* prosecuting attorney, *Thomas S. Hudson* and *Thomas J. Sammon,* for appellee.

*Hyman Friedman,* county public defender, *Marillyn Fagan Damelio* and *Richard L. Gedeon,* for appellant.

*Per Curiam.* Today we are called upon to review the conviction and death sentence of appellant. The court of appeals held that appellant's assignments of error were not well-taken and that the death penalty statutes are constitutional and were constitutionally applied in the instant case. For the reasons set forth below, we affirm the appellate court's ruling and uphold the death penalty sentence.

Appellant's first proposition of law urges that he was denied his right to a fair trial by an impartial jury, guaranteed by the Sixth and Fourteenth Amendments to the United States Constitution and R.C. 2945.25(C), when the trial court excused five jurors for cause. Upon review of the record, we determine that there was reasonable cause for the trial court to excuse a number of jurors on the basis of their own health, or personal problems at home needing their attention. Appellant, in his second proposition of law, argues that these rights were further denied by the so-called death-qualification process, authorized by *Witherspoon* v. *Illinois* (1968), 391 U.S. 510 [46 O.O.2d 368], and its progeny, prior to the guilt determination phase of his trial. These constitutional requirements have been embodied in R.C. 2945.25(C) and this court's decisions in *State* v. *Jenkins* (1984), 15 Ohio St. 3d 164, certiorari denied (1985), 473 U.S. __, 87 L. Ed. 2d 643, paragraph two of the syllabus, and *State* v. *Maurer* (1984), 15 Ohio St. 3d 239, paragraph two of the syllabus. A review of the record demonstrates that the jurors were excused under the constitutional principles embodied in *Witherspoon, supra; Adams* v. *Texas* (1980), 448 U.S. 38, 45; and *Jenkins, supra; i.e.,* their beliefs would lead them to ignore the law or violate the judge's instructions.

In his third proposition of law appellant argues that he was denied his right to confront witnesses by the trial court's protective order as to two of the state's witnesses. Confrontational rights are guaranteed to an accused through the Sixth and Fourteenth Amendments to the United States Constitution, *Pointer* v. *Texas* (1965), 380 U.S. 400, and by Section 10, Article I of the Ohio Constitution. Such rights are legitimately constrained by Crim. R. 16(B)(1)(e) which provides the trial court with authority to forbid disclosure of the names and addresses of witnesses "if the prosecuting attorney certifies to the court that to do so may subject the witness or others to physical or substantial economic harm or coercion." Certification is not satisfied by the prosecutor merely stating his or her conclusion that a witness might be subject to harm, but requires the state's reasons for requesting witness protection to appear on the record. *State* v. *Owens* (1975), 51 Ohio App. 2d 132, 147 [5 O.O.3d 109]. The reasons for withholding the identity of the state's witnesses who were also incarcerated in the Cuyahoga County Jail at the time, *i.e.,* the high risk of repercussions for producing evidence against a fellow prisoner, do appear on the record. In any event, these witnesses' identities were not

absolutely withheld, as they were present at the trial and subject to cross-examination. Appellant has failed to show the sufficient degree of prejudice to his ability to defend himself required for a conviction reversal (*State* v. *Parson* [1983], 6 Ohio St. 3d 442, syllabus), given his failure to exercise the options offered by the trial court of requesting indefinite continuances and using investigators to prepare his cross-examination.

In his fourth proposition of law, appellant contends the trial court committed reversible error in finding him competent to stand trial. Appellant failed to produce any evidence to rebut the presumption, contained in R.C. 2945.37(A), that a criminal defendant is competent. Since the adequacy of the data relied upon by the expert who examined the appellant is a question for the trier of fact, and since there was some reliable, credible evidence supporting the trial court's conclusion that appellant understood the nature and objective of the proceedings against him, this court will not disturb the finding that appellant was competent to stand trial. See 5 Ohio Jurisprudence 3d (1978) 212, Appellate Review, Section 608.

Appellant next contends, in his fifth proposition of law, that he was denied his right to an impartial jury by admission of prejudicial or otherwise irrelevant evidence, specifically photographs of the scene of the crime and bank envelopes found outside the victim's home. We have recently held that: "Properly authenticated photographs, even if gruesome, are admissible in a capital prosecution if relevant and of probative value in assisting the trier of fact to determine the issues or are illustrative of testimony and other evidence, as long as the danger of material prejudice to a defendant is outweighed by their probative value and the photographs are not repetitive or cumulative in number." *State* v. *Maurer, supra,* paragraph seven of the syllabus. In applying that statement of the law to the present case, we find, from an examination of the admitted photographs, no merit to appellant's contention that the trial court abused its discretion by authorizing their admission.

In his sixth proposition of law, appellant maintains that the trial court impermissibly allowed the state to comment upon his failure to testify in violation of *Griffin* v. *California* (1965), 380 U.S. 609 [32 O.O.2d 437], and that the prosecutor made several comments which inflamed the jury's passions to a degree justifying reversal. Specifically, appellant takes exception to the following portions of the prosecutor's closing argument:

"MR. SAMMON: Here they [Anderson and Brooks] come in and testify to you what this man [appellant] told them. And, again, ladies and gentlemen of the Jury, they [appellant] tell you they [Anderson and Brooks] were lying, but they offer no evidence to rebut that. * * * They could have brought somebody through those doors * * * and put them on the stand and say, 'No, Novarro Brooks and Michael Anderson were lying. It never took place.' * * * There is absolutely no evidence to contradict what they testified to, ladies and gentlemen."

A reference by the prosecutor in closing argument to uncontradicted

evidence is not a comment on the accused's failure to testify, where the comment is directed to the strength of the state's evidence and not to the silence of the accused, and where the jury is instructed, as here, to not consider the accused's failure to testify. *State* v. *Ferguson* (1983), 5 Ohio St. 3d 160. We find that the language used by the prosecutor in this case is not such that the jury would "naturally and necessarily" take it as comment on the failure of the accused to testify, and thus fails the test set forth in *State* v. *Cooper* (1977), 52 Ohio St. 2d 163 [6 O.O.3d 377], vacated on other grounds (1978), 438 U.S. 911. The prosecution is not prevented from commenting upon the failure of the defense to offer evidence in support of its case. *Lockett* v. *Ohio* (1978), 438 U.S. 586, 595 [9 O.O.3d 26]; *State* v. *Lane* (1976), 49 Ohio St. 2d 77, 86 [3 O.O.3d 45], vacated on other grounds (1978), 438 U.S. 911.

Appellant also takes exception to other prosecutorial closing remarks.[1] Although a conviction based solely on the inflammation of fears and passions, rather than proof of guilt, requires reversal (*State* v. *Agner* [1972], 30 Ohio App. 2d 96 [59 O.O.2d 208]), the statements in the instant case are not so inflammatory as to render the jury's decision a product solely of passion and prejudice against the appellant. *State* v. *Woodard* (1966), 6 Ohio St. 2d 14 [35 O.O.2d 8]. A request that the jury maintain community standards is not equivalent to the exhortation that the jury succumb to public demand as prohibited by the Eighth Appellate District in *State* v. *Cloud* (1960), 112 Ohio App. 208, 217 [14 O.O.2d 132]. Therefore, appellant was not denied his rights to a fair trial and an impartial jury.

Appellant's seventh proposition of law centers upon a claim that the evidence was so slight that "a reasonable hypothesis of innocence" must have remained, thereby establishing that the evidence could not demonstrate his guilt beyond a reasonable doubt. See *State* v. *Graven* (1978), 54 Ohio St. 2d 114, 118-119 [8 O.O.3d 113]. The evidence here was of a rifled purse, scattered coins, bank envelopes scattered throughout the

---

[1] The prosecution's argument was as follows:

"MR. SAMMON: And notice, ladies and gentlemen of the Jury, in State's Exhibit 4, at least one good thing came out of this is the fact that Mrs. Chmielewski had her Bible open.

"And I'm just wondering if you gave her an opportunity to say her prayers before you shot her?

"* * *

"Now, ladies and gentlemen of the Jury, looking at this picture of State's Exhibit 4, I am reminded that the crime that was committed here was not only against the laws of society, but it was also against the laws of God. And now some people, ladies and gentlemen, have the benefit, when they reach an old age, of dying in bed with their relatives holding their hand and comforting them. This woman, who was such a good woman, was denied that privilege and right. And the last thing she saw was this defendant sticking a gun in her face and killing her.

"Ladies and gentlemen of the Jury, the standards of this community are dictated by jurors such as you who listen to evidence and see evidence and reach fair decisions in cases such as these.

"I ask you, ladies and gentlemen, to maintain the standards of this community."

house and down to the street corner, appellant's presence in the victim's house within two hours of her body being discovered and shortly after a dispute with his brother about money, traces of lead particles on appellant's jacket sleeve cuff, a shoeprint found on decedent's nightgown matching appellant's shoe, and two separate admissions of details of the crime to former cellmates. It is well-established that the witnesses' credibility is for the trier of fact to judge and, if believed, as the jury must have here, the evidence establishes that any reasonable hypothesis of innocence has been eliminated.

Appellant in his eighth proposition of law argues that the trial court, by defining "proof beyond a reasonable doubt" as required by R.C. 2901.05, relieved the state of proving guilt beyond a reasonable doubt and of proving beyond a reasonable doubt that the aggravating circumstances outweighed the mitigating circumstances. This argument is similar to the one rejected by this court in *State* v. *Jenkins, supra,* at 211.

In his ninth proposition of law, appellant challenges as unconstitutional the sentencing instructions and prosecutor comment that the jury's recommendation of a death sentence is not binding on the court, and that the final decision as to whether the death penalty shall be imposed rests with the court. We specifically held that this instruction, though not preferred, does not constitute reversible error, *Jenkins, supra,* at 202-203, and the United States Supreme Court has recently denied certiorari in that case, *Jenkins* v. *Ohio* (1985), 473 U.S. __, 87 L. Ed. 2d 643. Appellant nevertheless challenges these jury instructions on authority of *Caldwell* v. *Mississippi* (1985), 472 U.S. __, 86 L. Ed. 2d 231. The United States Supreme Court there vacated a death sentence upon finding that a prosecutor's closing argument, urging the jury not to view itself as finally determining whether petitioner would die because a death sentence would be reviewed for correctness by the state supreme court, was inaccurate and misleading. The plurality of the court found that this diminished the jury's sense of responsibility which is indispensable to the Eighth Amendment's " 'need for reliability in the determination that death is the appropriate punishment in a specific case.' " *Id.* at 236, quoting *Woodson* v. *North Carolina* (1976), 428 U.S. 280, 305.

The *Caldwell* court felt that the state improperly created the impression that the appellate court would be free to reverse the death sentence if it disagreed with the jury's conclusion that death was appropriate. *Id.* at 246-247, fn. 7. Justice O'Connor noted that the case distinguished by the plurality, *California* v. *Ramos* (1983), 463 U.S. 992, does not "suggest that the Federal Constitution prohibits the giving of accurate instructions regarding postsentencing procedures." *Caldwell, supra,* at 248 (O'Connor, J., concurring). That is all that happened here; the judge told the jury that its death penalty recommendation is "just that—a recommendation, and is not binding upon the Court * * * [but that a life sentence] is binding upon the Court and the Judge must impose the specific life sentence which you

have recommended." Under R.C. 2929.03(D)(2) and (3), the jury and the trial court each make an independent finding as to whether the aggravating circumstances outweigh the mitigating factors, thus justifying the death sentence. No Ohio court is bound by the jury's weighing of the mitigating circumstances, as opposed to the Mississippi scheme reviewed by the *Caldwell* court. In Mississippi the jury's verdict of death would not be overturned unless "it 'was against the overwhelming weight of the evidence,' or if the evidence of statutory aggravating circumstances is so lacking that a 'judge should have entered a judgment of acquittal notwithstanding the verdict,' " *id.* at 248, quoting *Williams* v. *State* (Miss. 1984), 445 So. 2d 798, 811. We find that the jury instructions in the instant case were an accurate statement of the law and, therefore, were relevant to the valid state interest in educating the jury on the applicable law. However, because of the possible risk of diminishing jury responsibility, "* * * we prefer that in the future no reference be made to the jury regarding the finality of their decision * * *." *Jenkins, supra,* at 202.

In his tenth proposition of law appellant contends that, at the conclusion of the penalty phase, the trial court erroneously instructed the jury not to be influenced by considerations of sympathy or prejudice. Even if appellant had followed the correct procedures for having this court review this issue, we specifically rejected this argument in *State* v. *Jenkins, supra,* paragraph three of the syllabus.

In his eleventh proposition of law, appellant urges that this court abandon the "beyond a reasonable doubt" standard applicable to all criminal proceedings pursuant to R.C. 2901.05(A). Not only did appellant waive this issue by not complying with Crim. R. 30(A), but we also expressly rejected this argument in *Jenkins, supra,* at paragraph eight of the syllabus.

In his twelfth proposition, appellant argues that the jury should have been instructed that a life imprisonment sentence does not require a unanimous vote. Not only was this issue not briefed and decided below, but this alleged reading of R.C. 2929.03(D)(2) ignores the requirement set forth in Crim. R. 31(A) that all verdicts in criminal proceedings be unanimous. Furthermore, we rejected this argument in *Jenkins, supra,* at 213-214, and held that: "In returning a sentence of life imprisonment under R.C. 2929.03(D)(2), the jury's verdict must be unanimous." *Id.* at paragraph ten of the syllabus.

In proposition of law thirteen, appellant contends that a capital defendant is entitled to a special verdict on the question of intent to kill. We rejected this argument, which appellant neglected to raise below, in *Jenkins, supra,* at 212-213, by stating that the General Assembly did not require it when it drafted R.C. 2903.01(D).

Appellant in his fourteenth proposition of law avers that the submission to the jury of the presentence investigative and mental examination reports under R.C. 2929.03(D)(1) denied him confrontational and due process rights, as well as contravened the Ohio Rules of Evidence. The latter

argument is without merit due to the fact that the Rules of Evidence do not apply to sentencing proceedings. Evid. R. 101(C)(3).

The United States Supreme Court has held that confrontational rights do not apply to all types of hearings. *Wolff* v. *McDonnell* (1974), 418 U.S. 539 [71 O.O.2d 336]. All that due process requires with respect to post-conviction reports is giving the defendant a chance to rebut any alleged inaccuracies. See *Gregg* v. *Georgia* (1976), 428 U.S. 153, 189, fn. 37; *United States* v. *Papajohn* (C.A. 8, 1983), 701 F. 2d 760, 763; and *Farrow* v. *United States* (C.A. 9, 1978), 580 F. 2d 1339, 1360. Not only does appellant fail to argue that the reports were inaccurate, but he also failed to exercise the opportunity at the mitigation hearing to correct any erroneous information. Due process is not denied a defendant who fails to challenge the accuracy of statements as to which he has been denied an opportunity for cross-examination or confrontation. See *Williams* v. *New York* (1949), 337 U.S. 241, rehearing denied (1949), 337 U.S. 961; *Williams* v. *Oklahoma* (1959), 358 U.S. 576, rehearing denied (1959), 359 U.S. 956. R.C. 2947.06 authorizes a defendant's cross-examination, under oath, of the persons who compiled the report of a psychologist or psychiatrist, "as to any matter or thing contained therein." The appellant failed to exercise this right and cannot now be heard on a complaint that the admission of these reports, prepared at his own request, under R.C. 2929.03(D)(1), prejudiced him.

In his fifteenth proposition of law, appellant contends that the prosecutor's review, in closing argument, of the mitigating factors specifically set forth by the General Assembly in R.C. 2929.04(B), and argument that appellant failed to adduce evidence satisfying any of these factors, unfairly and prejudicially interfered with the sentencing determination. Not only was this argument not briefed and decided below, but also the trial court corrected any possible harm by correctly instructing the jury, shortly after the prosecutor's argument, that statutory as well as non-statutory mitigating factors may be proffered and considered in mitigation. In any event, any attorney misconduct is not material since the prosecutor never told the jury that the statutory factors were all that could be considered. Appellant's argument is without merit.

Appellant next challenges, in his sixteenth proposition of law, the constitutionality of R.C. 2929.03 and 2929.04 on the basis that the aggravating circumstances fail to distinguish the murderers who deserve the death penalty from those who do not. According to the appellant, the conduct used to convict him (*i.e.*, murder in the course of a robbery pursuant to R.C. 2903.01[B]) was also used to aggravate the offense to one in which the death penalty could be imposed under R.C. 2929.04(A)(7). This precise argument was rejected in *Jenkins, supra,* at 178. There we found that, "any duplication is the result of the General Assembly having set forth in detail when a murder in the course of a felony rises to the level of a capital offense, thus, in effect, narrowing the class of homicides in Ohio for which the death penalty becomes available as a sentencing option."

In proposition of law number seventeen appellant argues that Ohio's sentencing framework does not pass constitutional muster by failing to afford juries the opportunity to impose life sentences. The death penalty only becomes a mandatory sentence if the sentencing authority decides that the aggravating circumstances outweigh the evidence given in mitigation. R.C. 2929.04(B)(7) and (C) require "the sentencing authority to consider and weigh against aggravating circumstances any relevant mitigating factors which the defendant presents." *Jenkins, supra,* at 179. The statute does not require the jury to impose the death sentence instead of life imprisonment.

Appellant in his eighteenth proposition of law contends that the aggravating circumstances here did not, beyond a reasonable doubt, outweigh the mitigating factors. The aggravating circumstance was commission of a senselessly cruel aggravated murder in the course of an aggravated robbery. The meager evidence in mitigation was that the appellant pursued a life of crime to compensate for a lack of love in his childhood. The appellant failed to produce any evidence of the mitigating factors listed in R.C. 2929.04(B). In fact, the evidence produced at the trial and the mitigation hearing tends to establish that appellant's circumstances fall outside the diminished responsibility the legislative scheme implies it intends to have the jury take into account in imposing the death sentence. Appellant's explanation of his "life of crime" falls far short of mandating a holding that reasonable minds could never find, beyond a reasonable doubt, that, in the instant murder, the aggravating circumstances outweigh the mitigating factors. Our conclusion is that the aggravating circumstances do indeed outweigh the mitigating factors beyond a reasonable doubt.

In his nineteenth proposition of law, appellant argues that the death sentence imposed in the subject case is disproportionate to that imposed in similar cases, and is therefore violative of Sections 9, 10 and 16, Article I of the Ohio Constitution and the Fourteenth Amendment to the United States Constitution. Appellant bases his argument on the fact that other capital defendants throughout Ohio, who were charged with only one aggravating circumstance, have received life sentences, rather than the death penalty.

The United States Supreme Court's concern that the death penalty not be imposed arbitrarily or capriciously, *Furman* v. *Georgia* (1972), 408 U.S. 238, upon which appellant's argument is based, has been held satisfied when death-penalty-authorizing statutes require the sentencing authority to examine specific factors that argue in favor of, or against imposition of, the death penalty. *Proffitt* v. *Florida* (1976), 428 U.S. 242. States may constitutionally impose the death sentence if the discretion of the sentencing authority is " 'suitably directed and limited so as to minimize the risk of wholly arbitrary and capricious action' in imposing the sentence, *Zant* v. *Stephens* (1983), [462 U.S. 862,] 77 L. Ed. 2d 235, at 248." *Jenkins, supra,* at 168.

Ohio's "weighing statute" properly limits the sentencing authority's discretion to focus "attention upon the circumstances of the capital offense and the individual offender when considering whether to return a verdict imposing the death penalty." *Jenkins, supra,* at 173. It follows that "[m]erely counting the number of specifications charged does not demonstrate a disproportionate impact without reference to all aspects of the crimes." *State* v. *Maurer, supra,* at 246. Counting the specifications charged hardly takes into account all the particularized circumstances surrounding each capital offense and each individual offender, required by *Jurek* v. *Texas* (1976), 428 U.S. 262, 273-274. The United States Supreme Court has never found that the number of aggravating circumstances is the only factor permitted to be considered in a decision of whether to impose a death sentence.

As to appellant's final and twentieth proposition of law generally assailing the constitutionality of Ohio's death penalty statute, we find no merit therein. All of appellant's other challenges have previously been rejected by this court, in *Jenkins, supra.*

We reaffirm our holding in *Jenkins, supra,* paragraph one of the syllabus, that Ohio's capital punishment statutes are constitutional and affirm the judgment of the court of appeals that they were constitutionally applied in the instant case. Appellant's convictions and death sentence stand.

*Judgment affirmed.*

CELEBREZZE, C.J., LOCHER, HOLMES and DOUGLAS, JJ., concur.

SWEENEY, J., dissents.

C. BROWN and WRIGHT, JJ., dissent with opinion.

CELEBREZZE, C.J., concurring. While I join the majority decision upholding appellant's conviction and death sentence, I wish to add the following comments regarding several of the propositions of law raised by appellant.

The majority correctly concludes that neither the exclusion of several prospective jurors nor the death qualification process in the case *sub judice* violated appellant's right to a fair trial by an impartial jury. Appellant contends that the trial court improperly excused three jurors who, during *voir dire,* told the court that their moral views would make it impossible for them to impose the death penalty under any circumstances.[2]

---

[2] The pertinent portions of the dialogue between the court and each of these jurors was as follows:

"THE COURT: Listen, I know that you want to do your duty, and we appreciate your doing so.

Appellant's death-qualification argument is virtually identical to that rejected by this court in *State* v. *Jenkins* (1984), 15 Ohio St. 3d 164, 188, wherein we stated:

"It follows that, in striving to achieve an impartial jury—one that will fairly judge the facts and apply the law as instructed—the principles set forth in *Witherspoon, supra* [(1968), 391 U.S. 510], justify excluding those jurors who would never impose the death penalty. Jurors subject to challenge under *Witherspoon* because they refuse to follow the law not only render the jury impartial for the penalty phase, but also for the guilt phase, of the trial as well. * * *"

In essence, appellant argues that what has resulted by the *voir dire*

---

"This is a very difficult case involving the death penalty or a potential death penalty, and we don't want to put words in your mouth. And you seem to be saying, and I want to be fair, and I don't want to put words in your mouth, but that you don't believe in the death penalty, but you would like to do you duty; is that correct?

"MRS. WINISKI: That is correct.

"THE COURT: That is essentially correct?

"MRS. WINISKI: That is correct.

"THE COURT: And then that question of Mr. Sammon's is a fair one, that you really couldn't return a verdict for the death penalty if the facts warranted it, and you wouldn't follow the law?

"MRS. WINISKI: I don't think so.

"THE COURT: Fine. She is excused for cause."

"DR. LARSON: Yes, I understand it, because this, in a sense, I didn't get when I said previously that I would follow the law.

"THE COURT: Yes.

"DR. LARSON: I think it would—the answer would still stand. I would try to follow the law, but it still might be impossible for me."

"THE COURT: * * * You indicated that you would, when Mr. Oliver told you you were to follow the instructions of the Court.

"MR. MELENIK: Right.

"THE COURT: But my impressions were, when Mr. Sammon asked you if you would follow the instructions of the Court, and the instructions of the Court, if they indicated that under certain circumstances that you must impose the death sentence, you couldn't follow the instructions of the court; is that your answer, or not?

"MR. MELENIK: I think, yeah, I probably made a mistake. I couldn't follow the instructions of the Court, if they were to impose the death sentence.

"THE COURT: You could?

"MR. MELENIK: I could not.

"THE COURT: You could not?

"MR. MELENIK: I could not. I am sorry.

"THE COURT: Okay. I think that this is probably—

"MR. SAMMON: Could I just ask one more question, Judge?

"THE COURT: Yes.

"MR. SAMMON: All right. Are you saying, Mr. Melenik, under no circumstances would you follow the instructions of the Trial Judge and consider for the imposition of the death penalty?

"MR. MELENIK: I would not consider the death penalty at all.

"THE COURT: Thank you."

herein is a jury more likely to convict, rather than an impartial jury. As was stated in *Smith* v. *Balkcom* (C.A. 5, 1981), 660 F. 2d 573, 579, certiorari denied (1982), 459 U.S. 882:

"* * * The guarantee of impartiality cannot mean that the state has a right to present its case to the jury *most* likely to return a verdict of guilt, nor can it mean that the accused has a right to present his case to the jury *most* likely to acquit. But the converse is also true. The guarantee cannot mean that the state must present its case to the jury *least* likely to convict or impose the death penalty, nor that the defense must present its case to the jury *least* likely to find him innocent or vote for life imprisonment. * * *'" (Emphasis *sic.*)

Moreover, this court's decision in *Jenkins* is consistent with the United States Supreme Court's recent pronouncement in *Wainwright* v. *Witt* (1985), 469 U.S. __, 83 L. Ed. 2d 841, which affirmed the pronouncement set forth in *Adams* v. *Texas* (1980), 448 U.S. 38, 45, "* * * as the proper standard for determining when a prospective juror may be excluded for cause because of his or her views on capital punishment." *Wainwright, supra,* at 851. In *Adams,* the high court held that a "state may insist, however, that jurors will consider and decide the facts impartially and conscientiously apply the law as charged by the court." *Id.* at 45. In *Wainwright, supra,* the court reaffirmed *Adams* and clarified *Witherspoon,* stating at 851:

"But there is nothing talismanic about juror exclusion under *Witherspoon* merely because it involves capital sentencing juries. *Witherspoon* is not grounded in the Eighth Amendment's prohibition against cruel and unusual punishment, but in the Sixth Amendment. Here, as elsewhere, the quest is for jurors who will conscientiously apply the law and find the facts. That is what an 'impartial' jury consists of, and we do not think, simply because a defendant is being tried for a capital crime, that he is entitled to a legal presumption or standard that allows jurors to be seated who quite likely will be biased in his favor."

These three prospective jurors were dismissed precisely because they stated that they could not, for personal and moral reasons, conscientiously apply the law as instructed by the court. Thus, these persons were properly excluded in a manner consistent with *Witherspoon, Adams, Wainwright* and *Jenkins, supra.*[3] Accord *Foster* v. *State* (Md. App. 1985), 499 A. 2d 1236.

---

[3] In reaching our conclusion today, we are aware of the recent split decision of the Eighth Circuit Court of Appeals, sitting *en banc,* in *Grigsby* v. *Mabry* (C.A. 8, 1985), 758 F. 2d 226, certiorari granted (Oct. 7, 1985), *sub nom. Lockhart* v. *McCree* (1985), 474 U.S. __, 88 L. Ed. 2d 48.

In *Grigsby,* the federal court of appeals held that in the guilt phase of a capital trial a jury with "*Witherspoon* excludables" stricken for cause results in a jury which is conviction-prone and which violates a defendant's Sixth Amendment right to a fair and impartial jury.

The Eighth Circuit's decision is in direct conflict with, *inter alia,* the decisions of the

Appellant also complains that the trial court's exclusion of two other prospective jurors was part of a pattern of dismissing for personal reasons any juror who had expressed reservations about imposing the death penalty. The record demonstrates that this argument is without merit.

One of those jurors was excused on the basis that the nature and length of a capital trial would have made it very difficult for her to care for her eighty-three-year-old mother, who had recently become ill. The other juror was excused because the responsibilities of jury service would aggravate her nervous condition, causing stomach problems, insomnia and physical shaking. These were legitimate reasons for dismissal of these individuals. We can discern no pattern of dismissing, for personal reasons, only those jurors opposed to the death penalty and note that a third juror was dismissed due to personal anxiety even though he had expressed no reservations concerning the death penalty.

The majority also correctly concludes that there was reliable and credible evidence to support the trial court's determination that appellant was competent to stand trial. Pursuant to R.C. 2945.37(A), a defendant is presumed to be competent and must carry the burden of proving, by a preponderance of the evidence, that he is not competent to stand trial. Accord *State* v. *Chapin* (1981), 67 Ohio St. 2d 437 [21 O.O.3d 273].

The standard for determining competency was set over a quarter century ago in *Dusky* v. *United States* (1960), 362 U.S. 402, where the United States Supreme Court framed the test as whether the accused has a ra-

---

Fourth and Fifth Circuit Courts in *Smith* v. *Balkcom* (C.A. 5, 1981), 660 F. 2d 573, certiorari denied (1982), 459 U.S. 882; and *Keeten* v. *Garrison* (C.A. 4, 1984), 742 F. 2d 129.

As alternatives to the striking for cause of so-called *Witherspoon* excludables during the guilt phase of a capital trial, the Eighth Circuit recommended adding to the number of alternate jurors who sit during the guilt phase. If the defendant is convicted, a new *voir dire* would take place and the jury death-qualified, with the "*Witherspoon* excludables" stricken for the penalty phase. The court of appeals also proposed, as an alternative, identifying the "*Witherspoon* excludables" at the initial *voir dire* and empaneling sufficient alternate jurors to take their places after the guilt phase and during the penalty phase of a capital trial.

Although the United States Supreme Court will ultimately determine the validity of the Eighth Circuit's decision, we agree with the dissenters in that decision who found it both dangerous and ill-advised to require, in essence, two groups of jurors in a capital trial:

"Placing the moral responsibility on the same group of jurors to decide both guilt and punishment is justified by the most significant policy considerations. When one jury hears both phases of the case, the jurors that comprise it cannot evade the heavy responsibility placed upon them of whether a convicted person should receive the death penalty. The court today would seem to require the replacement of some members of the guilt-phase jury with death-qualified jurors for the purpose of considering the death penalty. This division of responsibility between the two groups, even if only a few are replaced, would dilute accountability and disadvantage the accused." *Grigsby, supra,* at 247.

Indeed, it is precisely such a diminished sense of responsibility among jurors with which the United States Supreme Court was concerned in *Caldwell* v. *Mississippi, infra.*

We also note that the Eighth Circuit did not, in writing its opinion, have the benefit of the Supreme Court's decision in *Wainwright* v. *Witt* (Jan. 21, 1985), 469 U.S. ____, 83 L. Ed. 2d 841.

tional and factual understanding of the proceedings against him as well as the present ability to consult with his lawyer with a reasonable degree of rational understanding.

In the case *sub judice,* the expert concluded that appellant was able to understand the nature of the proceedings against him and was able to assist in his defense. Because appellant produced no evidence to the contrary, the trial court correctly concluded that he failed to prove his incompetency by a preponderance of the evidence pursuant to R.C. 2945.37(A).

The majority properly finds no merit in appellant's contention that the trial court abused its discretion in admitting photographs of the scene of the crime and bank envelopes scattered outside the victim's home. Certainly the photographs of the scene were relevant insofar as the state sought to prove the circumstances surrounding this killing and the cause of Chmielewski's death. Further, these photographs were important to the state's proof of its contention that an imprint on the hem of Chmielewski's nightgown matched a portion of the shoe which appellant was wearing at the time of his arrest. These photographs were not pleasant viewing. They were not, however, so gruesome or gory as to inflame the passions of the jury to the material prejudice of appellant.

A number of bank envelopes were also admitted. This was because bank envelopes had been scattered in a trail leading from the scene of this crime, inside the home, into the street. This evidence was clearly relevant to illustrate the state's contention that this killing was committed in the course of an aggravated robbery, during which the killer rifled through the victim's bank envelopes and discarded them in his wake as he fled the home. Thus, the probative value of these photographs and bank envelopes outweighed the danger of any prejudice to appellant and were properly admitted.

In the case *sub judice,* appellant has also challenged as unconstitutional the prosecutor's comment in closing argument[4] and the trial court's instruction[5] informing the jury that its death sentence was a recommenda-

---

[4] Appellant objects to the following statement made by the prosecutor in closing argument:

"MR. SAMMON: The Court will instruct you on your proper role, ladies and gentlemen, and you must find—if you find the aggravating circumstances outweigh the mitigating factors, you must make a recommendation to the Court, but it's the Court, ladies and gentlemen, and I anticipate he will tell you that, that will make the ultimate decision in this case."

[5] The portion of the trial court's instruction to which appellant objects is as follows:

"A jury recommendation to the Court that the death penalty be imposed is just that—a recommendation, and is not binding upon the Court. The final decision as to whether the death penalty shall be imposed upon the defendant rests upon this Court.

"In the final analysis, after following the procedures and applying the criteria set forth in the statute, the Judge will make the decision as to whether the defendant, Lewis Williams, Jr., will be sentenced to death or to life imprisonment."

tion not binding upon the court. Appellant bases this challenge on the recent United States Supreme Court decision *Caldwell* v. *Mississippi* (1985), 472 U.S. __, 86 L. Ed. 2d 231. The majority properly points out that the situation in *Caldwell* is not applicable to the case *sub judice,* but relies mainly on Justice O'Connor's concurrence in order to distinguish *Caldwell.* I believe that the plurality opinion should also be addressed and distinguished.

The issue as framed by Justice Marshall was "whether a capital sentence is valid when the sentencing jury is led to believe that responsibility for determining the appropriateness of a death sentence rests not with the jury but with the appellate court which later reviews the case." *Caldwell, supra,* at 235-236. The prosecutor in *Caldwell* told the jury that its decision to impose the death penalty was not final, but rather was automatically reviewable by the Mississippi Supreme Court. The plurality stated that this "delegation" of sentencing responsibility encouraged by the prosecutor deprived the defendant of his right to a fair determination of the appropriateness of the death sentence because an appellate court, unlike the jury, was "ill-suited to evaluate the appropriateness of death in the first instance." *Caldwell, supra,* at 240. The court emphasized that the defendant in a capital trial has a constitutional right to full consideration of mitigating factors by those very persons who were present to hear the evidence, witnesses and argument. *Id.* The court concluded that the prosecutor's remarks had diminished the jury's sense of responsibility by urging jurors "to view themselves as taking only a preliminary step toward the actual determination of the appropriateness of death—a determination which would eventually be made by others and for which the jury was not responsible." *Id.* at 244. The *Caldwell* court stated further that the presumption of correctness with which Mississippi's appellate courts reviewed capital sentences made it impossible for an appellate court to determine the appropriateness of the death penalty in each defendant's individual circumstances.

The prosecutor's remarks and the instructions in the case *sub judice,* which informed the jury that its determination to impose the death penalty was a recommendation, must be examined in light of the *Caldwell* pronouncement. The final decision as to the appropriateness of the death penalty, the jury was told, was to be made by the trial court. No mention was made of appellate review.

These remarks and instructions were a correct statement of Ohio law. Under our statutory scheme, as opposed to that in Mississippi, the jury does not have sole responsibility for determining the appropriateness of death in the first instance. Its role is to make a recommendation to the trial judge, who makes the actual determination by *independently* weighing the aggravating circumstances and the mitigating factors after receiving the jury's recommendation that the sentence of death be imposed. R.C. 2929.03(D)(2) and (3). Even if the jury's sense of responsibility

was affected by knowledge of its role, the trial court, with whom the decision to impose the death penalty rests, serves as a check and balance for a jury's verdict which may not be appropriate. Although Ohio's statutory scheme does not place sole responsibility for sentencing on the jury in a capital case, we note that in the case *sub judice* the jury deliberated for twenty-three hours in the penalty phase alone, indicating that its appreciation of the gravity of its determination had not been diminished by the prosecutor's remarks or the court's instruction.[6]

Further, addressing the plurality's concern in *Caldwell,* the appropriateness of the death sentence in the case *sub judice* was determined in the first instance by those same persons who had been present throughout this trial to hear the evidence, witnesses, argument and mitigating factors—the jury *and* the trial judge. Additionally, there is nothing in the record which shows that either the jury or the trial judge was misled as to the nature of appellate review of capital cases in the state of Ohio. Indeed, our statutory scheme, in contrast to the presumption of correctness in Mississippi, mandates full and independent review and reweighing by appellate courts of the appropriateness of penalty determinations in each capital case. R.C. 2929.05(A). Thus, the case *sub judice* is readily distinguishable from *Caldwell, supra.* In Ohio, the appropriateness of a death sentence is *fully* considered at every stage from the jury's recommendation to the trial court's actual determination and, finally, by independent appellate review by both the court of appeals and state supreme court. For the foregoing reasons, I concur in the majority's conclusion that the *Caldwell* decision does not require the reversal of appellant's convictions.

Finally, I wish to add a caveat regarding the majority's conclusion (in

---

[6] It should also be noted that the record demonstrates that the trial judge endeavored to instill in the jury the importance of its role and indeed heightened the jury's sense of responsibility.

For example, the trial judge, prior to the jury's deliberation, instructed the jurors, *inter alia,* that:

"You decide the disputed issues and the Court provides you with the instructions of law. It is your sworn duty to accept these instructions and to apply the law as it is now given to you by me. You are not permitted to change the law, nor to apply your own conception of what you think the law should be, nor to disregard the law in order to avoid an unpleasant decision.

"Your initial conduct upon entering the jury room is a matter of importance. It is not wise immediately to express a determination to insist upon a certain verdict because if your sense of pride is aroused, you may hesitate to change your position even if you decide you are wrong.

"Consult with one another, consider each other's views and deliberate with the objective of reaching an agreement, if you can do so without disturbing your individual judgment. Each of you must decide this case for yourself, but you should do so only after a discussion and consideration of the case with your fellow jurors. Do not hesitate to change an opinion if convinced that it is wrong. However, you should not surrender honest convictions in order to be congenial or to reach a verdict solely because of the other jurors."

overruling appellant's fourteenth proposition of law) that the Rules of Evidence do not apply to sentencing proceedings. This sweeping statement is not altogether correct as regards the penalty phase of a capital trial.

Both Fed. R. Evid. 1101 and Ohio Evid. R. 101 state that the Rules of Evidence do not apply at proceedings for sentencing. It appears, however, that this statement is not meant to be as broad as it might seem. Two commentators note by way of explanation pertaining to Fed. R. Evid. 1101 that "despite the fact that Congress has chosen to provide that the Federal Rules of Evidence should not apply during most preliminary and post-trial parts of litigation, the fact remains that many of the Rules will be borrowed and continued in effect during these proceedings. Most of the Congressional concern was with the hearsay rule, and it is difficult to imagine that Congress intended that witnesses should testify without taking an oath, that interpreters should not be provided for non-English speaking persons, and that proper objections should not be made to offers of evidence in proceedings other than trials on the merits." Saltzburg & Redden, Federal Rules of Evidence Manual (3 Ed. 1982), at 761. As the authors note, Fed. R. Evid. 1101 may be interpreted essentially as a restriction on the application of the hearsay rule. *Id.* Indeed, R.C. 2929.03(D)(1) contains a specific exception to the hearsay rule which allows admission of presentence reports in the mitigation phase of death penalty trials.

The United States Supreme Court stated in *Gregg* v. *Georgia* (1976), 428 U.S. 153, 203-204 that "[s]o *long as the evidence introduced and the arguments made at the presentence hearing do not prejudice a defendant,* it is preferable not to impose restrictions." (Emphasis added.) The important protections provided by the Rules of Evidence can not be swept out the door in the penalty phase of a capital case because they are reflective in many instances of important constitutional and procedural safeguards. As illustrated by the foregoing, Fed. R. Evid. 1101 and its counterpart, Ohio Evid. R. 101, restrict the application of the hearsay rule in sentencing proceedings but are not meant to deny the application of the Rules of Evidence altogether during the penalty phase of a capital trial.

Accordingly, I agree with the majority that appellant's pre-sentence investigative and mental examination reports were admissible during the penalty phase. See R.C. 2929.03(D). I caution, however, that today's holding is not a carte blanche waiver of all the critical protections afforded by our Rules of Evidence which are crucial to the fair and just determination of the truth in *all* criminal proceedings. See Evid. R. 102.

For all the foregoing reasons, I concur in the majority's decision to affirm appellant's convictions and sentence of death.

WRIGHT, J., dissenting. Defendant-appellant Williams has challenged the constitutionality of the trial judge's specific instructions and the prosecutor's comments that a death sentence recommendation by the jury

would not be final or binding. These comments and instructions occurred during the sentencing phase of the trial. The court instructed the jury that its "recommendation" would not be final because the final decision as to the imposition of the death penalty rested with the court. As the majority correctly states, this was an accurate precis of Ohio law. This court previously disapproved of this form of instruction and argument but held that it was not reversible error in *State* v. *Jenkins* (1984), 15 Ohio St. 3d 164, at 202-203. The United States Supreme Court denied certiorari in that case, *Jenkins* v. *Ohio* (1985), 473 U.S. __, 87 L. Ed. 2d 643, but subsequently *unanimously* remanded to this court a case raising the same issue, *State* v. *Rogers* (1985), 17 Ohio St. 3d 174, 176-177, vacated *Rogers* v. *Ohio* (1985), 474 U.S. __, 88 L. Ed. 2d 452, for our reconsideration in light of the holding announced on June 11, 1985 in *Caldwell* v. *Mississippi* (1985), 472 U.S. __, 86 L. Ed. 2d 231.

I believe that the majority has misread both the thrust and content of *Caldwell.* In *Caldwell,* the court reviewed the prosecutor's comments to the jury in his closing argument that "* * * your decision is not the final decision * * *" because "the decision you render is automatically reviewable by the Supreme Court [of Mississippi] * * *." *Id.* at 237. In a plurality opinion (Justice Marshall, joined by Justices Brennan, Blackmun and Stevens, Justice O'Connor concurring in part; Justice Powell not participating), the court overturned the death sentence imposed by the jury and concluded that "* * * it is constitutionally impermissible to rest a death sentence on a determination made by a sentencer who has been led to believe that the responsibility for determining the appropriateness of the defendant's death [sentence] rests elsewhere. * * *" *Id.* at 239.

Justice Marshall determined that the prosecutor's statements in *Caldwell* were inaccurate and "wholly irrelevant to the determination of the appropriate sentence." *Id.* at 244. Justice O'Connor agreed that the prosecutor's statements in *Caldwell* were both misleading and inaccurate. *Id.* at 247. Both justices distinguished *California* v. *Ramos* (1983), 463 U.S. 992, in which the court upheld the constitutionality of a California statute requiring capital sentencing juries to be instructed that the governor of the state could commute a life sentence without possibility of parole to a lesser sentence with parole eligibility. See *Caldwell, supra,* at 243-244 and 247-249. Justice Marshall observed that the propriety of the instruction in *Ramos* rested on its relevancy to a legitimate state penological interest. *Id.* at 243. Justice O'Connor noted that *Ramos* would not prevent the giving of nonmisleading and accurate instructions concerning postsentencing procedure. *Id.* at 247. Justice Rehnquist, writing for himself, Chief Justice Burger and Justice White in dissent, relied on *Ramos* in arguing that the prosecutor's statements in *Caldwell* were constitutionally permissible because any misleading implications were cured by later statements. *Id.* at 254.

Unlike the law of many states, Ohio law provides for *de novo* review of death penalty sentences by the trial court, the court of appeals and this

court. R.C. 2929.03(D)(3) and 2929.05(A). The instructions given in the case at bar were accurate, but I believe it is apparent, in light of *Caldwell*, that the United States Supreme Court would hold an accurate instruction such as we have here concerning postsentencing procedure to be improper and prejudicial. The *Caldwell* court appears to hold that an instruction that is misleading in the sense that it diminishes the jury's sense of responsibility constitutes reversible error. It is most interesting that Justice Rehnquist commented even in his dissent in *Caldwell* that if the prosecutor had argued that "* * * the appellate court would correct any 'mistake' [that] the jury might make in choice of sentence * * * I might well agree that the process afforded did not comport with some constitutional norm related to procedural fairness. * * *" *Caldwell, supra,* at 252.

The plain truth of the matter is that that is precisely what happened in the case at bar. The prosecutor argued, and the trial judge informed the jury, that a death penalty sentence would be merely a recommendation. State-induced suggestions that the sentencing jury may shift its sense of responsibility for the imposition of the death penalty create a risk of substantial unreliability as well as potential bias in favor of death sentences. See *id.* at 240-242. For example, a jury might wish to "delegate" its responsibility for sentencing and minimize the importance of its role by recommending a death sentence because only a death sentence would receive *de novo* review by the trial and appellate courts. See *id.* at 242. Legal authorities have strongly condemned the sort of instructions and argument found in this case.[7]

In candor, I am not an admirer of Justice Marshall's brand of Eighth Amendment jurisprudence. However, I must agree with him that instructions that allow the jury to shift its sense of responsibility for the imposition of the death penalty are constitutionally impermissible. In my experience as a trial judge, I found that jurors in hard cases look to the trial judge for guidance, legal instruction and comfort. I am sure that the type of instructions given here were most comforting. However, they were also most devastating to the defendant's right that jurors "confronted with the truly awesome responsibility of decreeing death for a fellow human will act with due regard for the consequences of their decision * * *." *McGautha* v. *California* (1971), 402 U.S. 183, 208 [58 O.O.2d 243].

The consequence of a jury's decision regarding imposition of the death

---

[7] *Caldwell, supra,* at 242-243 and fn. 5; *People* v. *Morse* (1964), 60 Cal. 2d 631, 649-653, 36 Cal. Rptr. 201, 212-215, 388 P. 2d 33, 44-47; *Pait* v. *State* (Fla. 1959), 112 So. 2d 380, 383-384; *Hawes* v. *State* (1977), 240 Ga. 327, 335, 240 S.E. 2d 833, 839; *Ice* v. *Commonwealth* (Ky. 1984), 667 S.W. 2d 671, 676, certiorari denied (1984), 468 U.S. ___, 83 L. Ed. 2d 125; *State* v. *Willie* (La. 1982), 410 So. 2d 1019, 1034-1035; *Poole* v. *State* (1981), 290 Md. 114, 125, 428 A. 2d 434, 440; *Wiley* v. *State* (Miss. 1984), 449 So. 2d 756, 761-763; *State* v. *Mount* (1959), 30 N.J. 195, 152 A. 2d 343; *People* v. *Johnson* (1940), 284 N.Y. 182, 30 N.E. 2d 465; *State* v. *Jones* (1979), 296 N.C. 495, 497-500, 251 S.E. 2d 425, 427-428; *State* v. *Gilbert* (1979), 273 S.C. 690, 697-698, 258 S.E. 2d 890, 894.

sentence in Ohio has not been diminished by the statutory provision for *de novo* review. As of February 17, 1986, sixty-three death sentences had been imposed under the Ohio statute. Of that number, only *one* individual's death sentence was modified to life imprisonment by a trial court, and only *one* death sentence was reversed by a court of appeals. Thus, although a jury's decision to recommend imposition of the death penalty may theoretically be only a recommendation, in reality that decision is virtually final.

Although the jury instructions in the case at bar may have been accurate, their impact on the jury's sense of the "awesome responsibility" with which it was charged compels reversal of appellant's death sentence. I have had occasion to pass the death penalty upon an individual, and I am willing to uphold the law. However, I cannot in good conscience fail to dissent in this case.

I would uphold appellant's conviction, but would reverse his death sentence and remand for resentencing.

C. Brown, J., concurs in the foregoing dissenting opinion.