DECISION AND JUDGMENT ENTRY
{¶ 1} This appeal comes to us from a judgment issued by the Wood County Court of Common Pleas, following appellant's no contest plea to a fourth degree felony. Because we conclude that the trial court erred in finding appellant to be competent to stand trial and in accepting her no contest plea, we reverse. *Page 2 
 {¶ 2} On March 16, 2006, appellant, Yvonne Nickell, was indicted on one count of assaulting a police officer, in violation of the R.C.2903.13(A), a fourth degree felony. The charge stemmed from an incident which apparently occurred while appellant was being held in jail on another charge. As a result of appellant's irrational behavior, she was taken in early March 2006, to Northcoast Behavioral Healthcare ("Northcoast") facility for assessment and treatment. Since serious questions arose regarding appellant's competence to stand trial, the court ordered an assessment by the Court Diagnostic and Treatment Center. On May 15, 2006, the court conducted a competency hearing. At that hearing, the state submitted the April 19, 2006 Court Diagnostic report, which found appellant to be competent.
 {¶ 3} Appellant then offered testimony and a report by psychologist Dr. Colleen R. Snitch from a second assessment performed on May 1, 2006, at Northcoast. This later report was a follow up to the initial finding of incompetency in an evaluation performed on March 3, 2006, when appellant was admitted to Northcoast. In this second assessment, Dr. Snitch again found appellant to be incompetent to stand trial. The psychologist explained that her report and conclusions were based on the assessment interview, recent in-patient treatment history with and personal observation of appellant, and appellant's progress from the March assessment. She noted in the report that appellant had a long mental health history which included Bipolar Disorder, earlier substance abuse, and a seizure disorder resulting from a childhood head injury. The psychologist indicated that appellant's blood tests did not show the correct corresponding *Page 3 
levels for the drugs she was receiving for her mental illness and the seizures. As a result, appellant was then required to remain at the nurse's station for one-half hour after taking her medications.
 {¶ 4} Dr. Snitch stated that although appellant's score on a court competency evaluation test had significantly improved from the first assessment, appellant still tested below the competency cut-off score of 70. In addition, the psychologist stated that appellant's mental illness symptoms were not yet well controlled, which interfered with her ability to understand the nature and objectives of the legal proceedings or to meaningfully work with her attorney in her own defense. Therefore, the psychologist opined that appellant was not yet able to meaningfully assist her attorney in her defense. Dr. Snitch recommended that appellant continue her in-patient treatment at Northcoast, to ensure that appellant continue to take the appropriate medications, with a possible transfer of the case to the probate court. The psychologist noted that appellant was likely not to continue taking her medications if she left the hospital setting.
 {¶ 5} At the conclusion of the hearing, the court found appellant to be competent, but did not order her to remain in treatment at that time and released her on her own recognizance. Seven months later, on December 18, 2006, appellant again appeared before the court to enter a plea pursuant to a plea bargain. After a protracted and often confusing dialogue, appellant entered a "no contest" plea and was found guilty of assaulting a police officer. Two months later, in February 2007, the court sentenced appellant to one year of community control, reserving a sentence of 18 months *Page 4 
incarceration. The court also required her to be further assessed for chemical dependency and substance abuse treatment, for mental health counseling and to complete all recommendations, at appellant's cost. She was also ordered to pay court costs and to pay a one-time $50 supervision fee to the Adult Probation Department.
 {¶ 6} Appellant now appeals from that decision, arguing the following two assignments of error:
 {¶ 7} "Assignment of Error Number One
 {¶ 8} "The trial court did not substantially comply with the requirements of Criminal Rule 11.
 {¶ 9} "Assignment of Error Number Two
 {¶ 10} "The determination that the appellant was competent to stand trial was in conflict with the competent, credible evidence adduced at hearing, and was not supported by the evidence adduced."
 I. {¶ 11} We will first address appellant's second assignment of error. Appellant essentially argues that the evidence presented did not support the trial court's determination that appellant was competent to stand trial. We agree.
 {¶ 12} "It is uncontroverted that the conviction of an accused person while he is legally incompetent violates due process." State v.Chapin (1981), 67 Ohio St.2d 437, 439, citing Bishop v. UnitedStates (1956), 350 U.S. 961. Thus, a person who lacks the capacity to understand the nature and object of the proceedings against him, to consult *Page 5 
with counsel, and to assist in preparing his defense may not be subjected to a trial. State v. Smith (2000), 89 Ohio St.3d 323, 329. See also, State v. Berry (1995), 72 Ohio St.3d 354, 359 (fundamental principles of due process require that a criminal defendant who is legally incompetent shall not be subjected to trial). The test to determine whether a defendant is competent to stand trial is "whether he has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding and whether he has a rational as well as factual understanding of the proceedings against him." Dusky v. United States (1960), 362 U.S. 402.
 {¶ 13} In addition, Ohio statutory law provides a right of a criminal defendant not to be tried or convicted of a crime while incompetent. R.C. 2945.38. The burden of establishing incompetence, however, is upon the defendant. See State v. Williams (1986), 23 Ohio St.3d 16, 19. A defendant is presumed competent unless he proves incompetence by a preponderance of the evidence. R.C. 2945.37(G), State v. Hicks (1989),43 Ohio St.3d 72, 79. Generally, an appellate court will not disturb a trial court's finding of legal competency if the record contains reliable and credible evidence in support of that finding. State v.Williams, supra, at ¶ 4; State v. Hardin, 6th Dist. No. L-06-1194,2007-Ohio-747, ¶ 15. In addition, the weight to be given to differing expert opinions as to a defendant's competency is also generally a matter of credibility. See State v. Hicks, supra; State v.Williams, supra, at 19; State v. DeHass (1967), 10 Ohio St.2d 230, syllabus. *Page 6 
 {¶ 14} Depending on the results of a review of a defendant's competency to stand trial, the court has several options: it may order the defendant to go to trial, extend treatment to the maximum period allowed by statute, or have the case dismissed without prejudice. R.C.2945.38(F) and (G). Youngstown v. Ortiz, 153 Ohio App.3d 271,2003-Ohio-2238, ¶ 48. If the case is dismissed, the defendant may be subject to civil commitment proceedings. R.C. 2945.38(C);Youngstown, supra.
 {¶ 15} In the present case, we have serious concerns regarding the court's finding of competency for two reasons. First, the trial court apparently relied solely on the Court Diagnostic evaluation by Dr. Mark Pittner. His report was based upon a single interview, was less detailed and specific to appellant's mental health history, and stated vague, generalized conclusions. Moreover, Dr. Pittner referenced previous competency evaluations of appellant conducted by another psychologist in 1992, and an evaluation performed by himself in 2004. Dr. Pittner's report, conducted on April 19, 2006, was based in part on that evaluation from two years earlier, in which he found her to be competent. Except as a history of her mental illness, we find little, if any, relevance of prior findings of competency two and fourteen years earlier to the defendant's current evaluation. Each competency assessment must be based on the defendant's status at the time the proceedings are taking place.
 {¶ 16} Dr. Snitch's report, on the other hand, was based on not only the 90 minute assessment interview and testing, but on her own personal observations over several months, as appellant's own mental health treatment provider. Dr. Snitch had also *Page 7 
previously evaluated appellant, but only two months earlier, in relationship to the current proceedings. Appellant had been admitted for assessment to Northcoast because she was "uncooperative at the jail, was paranoid, threw feces at an officer and tried to take her clothing off at court." As a result of the March 2006 evaluation, Dr. Snitch found appellant to be "Incompetent to Stand Trial, Restorable (2945.38B)." During her testimony and in her report, Dr. Snitch explained that since appellant had been maintaining her medication while a patient at Northcoast, her test score on the Georgia Court Competency Test, had risen from a 42 to 64. Nevertheless, Dr. Snitch stated that a cognitive score of 70 or higher was needed to be considered "competent."
 {¶ 17} Further, Dr. Snitch also indicated that appellant still had great difficulty focusing and concentrating on subjects, and in expressing her thoughts. At the hearing, Dr. Snitch acknowledged that appellant's confusion about her attorney's name was clarified after the doctor learned that appellant had been represented by several different attorneys. Nevertheless, Dr. Snitch opined that, despite appellant's recent improvement, she "still has a difficult time, I think, expressing herself in a clear fashion. * * * I think she does know, for example, what a judge does, but it's difficult for her to actually focus and come out with the right answer." Although appellant might be able to at times understand certain legal issues with a great deal of explanation by her lawyer, appellant's "symptoms of her mental illness are still not yet well controlled, and she is still confused about her legal situation." In our view, Dr. Snitch's report was much more relevant and credible to appellant's current condition, because Dr. Snitch had longer and closer contact *Page 8 
with appellant during treatment, and her evaluation did not rely on old, unrelated evaluations.
 {¶ 18} The second reason for questioning appellant's competence is evident from her responses in court. The following excerpt from the plea hearing on December 18, 2006, indicates appellant's confusion. The court conducted the standard questioning as to appellant being under the influence of any drugs; no discussion of appellant's previous non-appearance for any court proceedings in this case or bail had been discussed. The following interchange occurred between appellant, the court, and her attorney, Ms. Baronas.
 {¶ 19} "THE COURT: Is there anything you can think about that you don't completely understand?
 {¶ 20} "MS. NICKELL: Yeah. What I didn't understand is the question that he just commented. I got sent to jail for being the $25,000 bail bond. I had no missing dates of court, and I never missed a date and everything, walked out. And I got taken to jail, and I never missed a date. On the paper it said to come up the 28th. It don't have the time written. And I said it was ten o'clock, and I was here. I came here. I live right across the street from the court. And I came to court, and they said, "You're under arrest. You're late." And the time wasn't even on the paper.
 {¶ 21} "* * *
 {¶ 22} "THE COURT: Have there been any threats or promises made to you in connection with your plea of no contest? *Page 9 
 {¶ 23} "MS. NICKELL: Well, asking of this. My family, my mother, and my man that I work for, Mr. Roe, pardon me. He is very upset wanting to know why I was laying naked on the jail cell, and I got a big scar on my stomach, straight down about month ago. December. December something.
 {¶ 24} "THE COURT: Remember now, the question is have there been any threats made to you in connection with your plea of no contest? Has anyone threatened you?
 {¶ 25} "MS. NICKELL: What do you mean? No, no. I've had trouble with a lady in jail. Tried a little — the actual charge, the assault. Caught her lying. I don't want a plea bargain to get out of here. That's why I'm doing it.
 {¶ 26} "MS. BARONAS: Listen to the Judge's question, and answer his question, okay? Just answer the question he asks you. Can you do that? Listen to the Judge's questions.
 {¶ 27} "THE COURT: Is your plea of no contest, is that offered voluntarily? Of your own free will?
 {¶ 28} "MS. NICKELL: Yes.
 {¶ 29} "THE COURT: Do you understand the nature of the charge against you, which is assault on a peace officer?
 {¶ 30} "MS. NICKELL: I didn't do it. When I reached for my medicine at the nurse, when I reached across, my arm jerked. I don't remember what happened next. *Page 10 
 {¶ 31} "THE COURT: You entered a plea of no contest. I want to ask you whether you understand what the charge means, assault on a peace officer?
 {¶ 32} "MS. NICKELL: Well, my family wondered how could I be charged with it when they didn't give me my medicine, and my muscles don't work.
 {¶ 33} "MS.BARONAS: Do you understand what you're charged with? Listen to the question.
 {¶ 34} "THE COURT: Do you under stand the charge?
 {¶ 35} "MS. NICKELL: Yeah.
 {¶ 36} "MS.BARONAS: You understand the charge, right? He's going to ask you another question.
 {¶ 37} "* * *
 {¶ 38} " THE COURT: Do you understand that if you are sent to prison, that you would be subject to up to three years of post-release control following that prison term?
 {¶ 39} "MS. NICKELL: What? How did he mean that?
 {¶ 40} "MS.BARONAS: If he sent you to prison, if you go to prison — remember, we talked about this — you could do all your time in prison and be released on supervision call post-release control. And if you violate the terms of that, you could go back to prison. Do you understand that?
 {¶ 41} "MS. NICKELL: Yes.
 {¶ 42} "THE COURT: And you understand the consequences of violating one of those post-release control sanctions should they be imposed upon you? *Page 11 
 {¶ 43} "MS. NICKELL: Yes. Make sure of that. Because being in town, because I can't drive, I want to make sure.
 {¶ 44} "* * *
 {¶ 45} "THE COURT: You understand you can have a speedy and public trial by court or jury?
 {¶ 46} "MS. NICKELL: What does that mean?
 {¶ 47} "THE COURT: It means you have a right to have a jury — trial to a jury or to the judge. Do you understand that?
 {¶ 48} "MS. NICKELL: Yeah.
 {¶ 49} "MS. BARONAS: Right now he's asking, do you understand that?
 {¶ 50} "MS. NICKELL: Yes, sir.
 {¶ 51} " THE COURT: Do you understand that at that trial you can see, hear, confront and cross examine anyone testifying against you? Do you understand that?
 {¶ 52} "MS. NICKELL: The officer wouldn't —
 {¶ 53} "MS. BARONAS: Do you understand that's your right to cross-examine those witnesses? Do you understand that?
 {¶ 54} "MS. NICKELL: Yes, sir.
 {¶ 55} "THE COURT: Do you understand you can use the power and process of the court to compel the production of any evidence or the appearance of any witness to come and testify in behalf of your defense?
 {¶ 56} "MS. NICKELL: After this? *Page 12 
 {¶ 57} "MS. BARONAS: Do you understand we have the right to call witnesses on your behalf? You remember that? That's what he's asking you, do you understand you have the right to call your own witnesses?
 {¶ 58} "MS. NICKELL: For now?
 {¶ 59} "MS. BARONAS: No, if we had a trial.
 {¶ 60} "MS. NICKELL: Yeah, that's why we did that.
 {¶ 61} "MS. BARONAS: If we had a trial, you could call your own witnesses by subpoena. Do you understand that? He just wants you to understand you have that right.
 {¶ 62} "MS. NICKELL: Yeah.
 {¶ 63} "MS. BARONAS: Now he's going to ask you another question.
 {¶ 64} "THE COURT: You understand if we had a trial, and you have the right to an attorney, such as Miss Baronas, at all times?
 {¶ 65} "MS. NICKELL: Yeah, that's why I ask her always. I don't want to cause trouble.
 {¶ 66} "THE COURT: You understand you may testify for yourself only if you choose to do so?
 {¶ 67} "MS. NICKELL: Yeah.
 {¶ 68} "MS. BARONAS: If you had a trial, you can call witnesses, and you could also testify. He's asking you if you understand you could testify if you wanted to, but nobody could make you. Do you understand that question?
 {¶ 69} "MS. NICKELL: Yeah. *Page 13 
 {¶ 70} "MS. BARONAS: Then you need to tell him you understand that.
 {¶ 71} "MS. NICKELL: Sorry, sir. Because my doctor was wanting to do this stuff, he was upset.
 {¶ 72} "THE COURT: Do you understand the question?
 {¶ 73} "MS. NICKELL: Yeah.
 {¶ 74} "MS. BARONAS: Do you understand the question?
 {¶ 75} "MS. NICKELL: Yeah.
 {¶ 76} "THE COURT: Do you understand that if you do not choose to testify, the refusal has no bearing on your guilt or innocence, and the prosecutor cannot comment on it?
 {¶ 77} "MS. NICKELL: The — the prosecutor can't?
 {¶ 78} "MS. BARONAS: If you decided you didn't want to testify, the prosecutor can't say anything to the jury about that because you have the absolute right not to testify. Do you understand that?
 {¶ 79} "MS. NICKELL: Yeah.
 {¶ 80} "MS. BARONAS: He's going to ask another question.
 {¶ 81} "THE COURT: Listen to this one carefully because it's a long one. If you are found guilty at trial and you are unable to afford an attorney, an attorney would be appointed free of charge, a transcript of the trial would be provided to you without cost to determine if there should be an appeal form the jury's verdict of guilty. Do you understand that? *Page 14 
 {¶ 82} "MS. NICKELL: Well —
 {¶ 83} "MS. BARONAS: If there was a trial — which we're not going to have — if you were convicted, you have the right to have a lawyer appointed to represent you on appeal. Do you understand that?
 {¶ 84} "MS. NICKELL: (Inaudible.)
 {¶ 85} "MS. BARONAS: Yvonne, if there was a trial and if you were convicted at trial, you have the right to have an attorney appointed to represent you for purposes of appealing the jury's verdict. Do you understand that?
 {¶ 86} "MS. NICKELL: Yes.
 {¶ 87} "MS. BARONAS: He's going to ask you another question. Listen to the question.
 {¶ 88} "* * *
 {¶ 89} The prosecutor then proffered what facts would have been presented, and there was a discussion regarding appellant's signatures on various plea forms. The court then continued.
 {¶ 90} "THE COURT: Thank you. Miss Nickell, any questions at all about what's happening today?
 {¶ 91} "MS. NICKELL: Well, one main thing. I'm not — I never in the world tried to hit the man I didn't know. I got arrested the 13th on a false charge and the bank noticed dropped the thing, the bank took money out of my bank. *Page 15 
 {¶ 92} "MS. BARONAS: He's asking you what we're doing today, not what happened at the bank. Do you understand everything the Judge is talking about?
 {¶ 93} "MS. NICKELL: Yes.
 {¶ 94} "MS. BARONAS: Any questions on what we talked about for the Judge?
 {¶ 95} "MS. NICKELL: Hopefully — I hope you realize I did not have control of myself, and I never in the world would reach and grab medicine. I didn't do that.
 {¶ 96} "MS. BARONAS: Talk to him. This is a new date. You're remembering the sentencing dates. We're going to get to that down the road. Do you have any other questions for the Judge today?
 {¶ 97} "MS. NICKELL: Well, call the doctor.
 {¶ 98} "MS. BARONAS: I'm going to talk to your doctor. Do you have any other questions for the Judge about what we're doing today?
 {¶ 99} "MS. NICKELL: Well, sir, to ask that, what comment to my doctor of that.
 {¶ 100} "MS. BARONAS: I'm going to talk to him. Okay? Do you have any other questions for the Judge today?
 {¶ 101} "MS. NICKELL: No, thank you.
 {¶ 102} "THE COURT: Do you understand that I can proceed immediately to sentencing if I accept the plea of no contest and find you guilty? Do you understand that?
 {¶ 103} "MS. NICKELL: That you don't or do?" *Page 16 
 {¶ 104} The court then accepted appellant's no contest plea. Two months later, the court held the sentencing hearing and the following dialogue took place during that proceeding.
 {¶ 105} "MS. BARONAS: Your honor, I have had an opportunity to review the presentence investigation report. I would just make a couple comments. I also provided the Court this afternoon with a letter from Ms. Nickell's doctor, Dr. de Carvalho, outlining some of her neurologic issues.
 {¶ 106} "Judge, by way of comments with regards to the information before the Court. Miss Nickell's mental health issues date back to twenty-two years where she required at least four hospitalizations during that period of time. She also — Dr. de Carvalho's letter indicates a significant neurologic disorder that he wants her to have seizure consults, and while on medication has not resolved completely. In fact, that was some of the issues in this particular case. When she has a seizure, her ability to think and reason and make appropriate judgments is affected, and that is to some great extent her explanation to what happened in this particular case.
 {¶ 107} "I don't think she made any — I don't think she intended to injure anybody. I don't think she intended to be aggressive towards the deputy and the nurse at the jail. I think because of the problems she has, both psychologically and neurologically, she could be a very difficult person at times to deal with. Even Dr. de Carvalho mentioned that in his letter, a number of doctors discharged her as a patient because she can be so difficult. Judge, I think it's never her intention to be that way, but at times it *Page 17 
can be very challenging to work with Miss Nickell, and as the Court knows, there have been a number of lawyers the last couple of years and with regard to a couple lawyers.
 {¶ 108} "While she does have prior contact with the legal system, Judge, it dates back a number of years, it appears in the last ten years or so she hasn't had any convictions. She's had contact, and have all ended up being dismissed until this point. I would ask the Court to take into consideration that she does have significant mental health and neurological problems which cause her to not be able to function very well in society at all.
 {¶ 109} "* * *
 {¶ 110} "THE COURT: Okay, Miss Nickell, anything you want to state on your own behalf?
 {¶ 111} "MS. NICKELL: Well, I wasn't sure of that date, December 18th, of the bargain. I wanted to still take it on January 15th for trial, sir, I did not go to hit the man. I can remember walking. I wanted them to ask, `What do you think I even hit him for?', because I remember walking to that door, reaching. There was a no-pass line, and an arm went out. I braced against the wall like that, with my butt muscles. I had no meds since, and I couldn't use my body. But I did walk to the door because I wanted it. I wanted my medicine.
 {¶ 112} "In the hospital I'm not allowed to get out of the bed until they work right, you know. And I had to walk to the door. And my neurologist stated that's critical. When they don't feed you, you don't get oxygen. And if I don't have the medicines for a *Page 18 
half hour to an hour, two to three days later, it affect [sic] my muscles. I can never miss it, and that affects it more.
 {¶ 113} "And the 13th I was arrested. It was the 15th, and I woke up naked in the jail cell, and blood, all this. But nothing was done. And I work for a farmer. He brought my medicine. The pharmacy gave me an extra billing. Even though I bought one, it was a hassle. He brought it, and they never gave me the medicine, and my body didn't work right. I was a month and a half in the hospital on my back, remember? And this is — I wasn't given the medicine, and I didn't try to hit the man. I remember I wanted the medicine. Bang, I hit the button.
 {¶ 114} "THE COURT: Thank you. Thank you."
 {¶ 115} In this case, we note that the court never conducted an interview or spoke with appellant during the competency hearing in May 2006. From the record, it appears that appellant was not even present at this hearing. Even presuming that the court's initial inclination was to accept the Court Diagnostics report in favor of competency, however, appellant's subsequent conversations and responses during the plea and sentencing hearings clearly indicate her inability to process and understand the legal aspects of her case. Appellant may have understood that she had been charged with allegedly striking a police officer, and even that she could be punished for that offense. That, however, is where her comprehension ended. *Page 19 
 {¶ 116} The excerpts illustrate the very concerns presented by Dr. Snitch: appellant had great difficulty in focusing on or understanding the court's questions. When she indicated that she did not understand, the court or her attorney continued to merely repeat the question. She was not asked to explain in her own words what had been said or what she understood. Her "yes" or "yeah" answer often came only after the question was repeated by both the court and her attorney several times. If appellant understood any given question, within mere moments, her subsequent responses signaled that she did not, in fact, retain that understanding as it applied to the proceedings as a whole.
 {¶ 117} Thus, even with the repetitive coaxing and questioning, appellant was unable to sufficiently focus on and comprehend the nature and objectives of the proceedings. Many of appellant's answers were non-responsive, indicating that she clearly did not understand that under a no contest plea, she would likely be found guilty, or even why she had been charged with the offense.
 {¶ 118} Even the court itself expressed that it had difficulty discerning whether appellant's inability to comprehend was due to lack of education or mental health issues. Nothing in the record indicates that appellant was "faking it," nor did the trial court make such a finding. Instead, we conclude that appellant's ability to understand or to become "educated" as to the legal issues involved was inextricably intertwined with her mental health and medication issues. Consequently, we conclude that the record shows that, due to her mental illness and somewhat limited cognitive abilities, appellant *Page 20 
was unable to fully participate in her defense or to appreciate the ramifications of the no contest plea and subsequent conditions of sentencing.
 {¶ 119} Therefore, we conclude that the trial court's finding of competency was not supported by competent, credible evidence. Accordingly, appellant's second assignment of error is well-taken.
 II. {¶ 120} In appellant's first assignment of error, she argues that the trial court did not comply with the requirements of Crim.R. 11 when accepting her no contest plea.
 {¶ 121} A waiver of defendant's constitutional right to trial must be knowing, intelligent, and voluntary. State v. Engle, 74 Ohio St.3d 525,527. Crim.R.11(B) (2) provides:
 {¶ 122} "The plea of no contest is not an admission of defendant's guilt, but is an admission of the truth of the facts alleged in theindictment, information, or complaint, and the plea or admission shall not be used against the defendant in any subsequent civil or criminal proceeding." (Emphasis added.)
 {¶ 123} In addition, Crim.R. 11 (C) states, in pertinent part:
 {¶ 124} "(2) In felony cases the court may refuse to accept a plea of * * * no contest, and shall not accept a plea of * * * no contest without first addressing the defendant and doing all of the following: *Page 21 
 {¶ 125} "(a) Determining that the defendant is making the plea voluntarily, with the understanding of the nature of the charges and of the maximum penalty involved * * *.
 {¶ 126} "(b) Informing the defendant of and determining that the defendant understands the effect of the plea of * * * no contest, and that the court, upon acceptance of the plea, may proceed with judgment and sentence.
 {¶ 127} "(c) Informing the defendant and determining that the defendant understands that by the plea the defendant is waiving the rights to jury trial, to confront witnesses against him or her, to havecompulsory process for obtaining witnesses in the defendant'sfavor, and to require the state to prove the defendant's guilt beyond a reasonable doubt at a trial at which the defendant cannot be compelled to testify against himself or herself." (Emphasis added.)
 {¶ 128} In this case, as we noted in our disposition of appellant's second assignment of error, appellant did not fully appreciate and understand the nature of the charges or her plea, or that she could actually be sent to prison, should she violate community control conditions. On its face, appellant's plea appears to be voluntary, since she eventually replied "yes" or "yeah" when questioned by the court. Her attorney also stated that appellant had expressed her wish to plead no contest.
 {¶ 129} Nevertheless, appellant continued to protest her innocence during both the plea and sentencing hearings, offering explanations which contradicted the state's evidence, and asking that the court talk to her doctor. Her comments and *Page 22 
responses indicate that she did not understand that by pleading no contest, she was agreeing to the truth of the state's version of the facts, namely that she had intentionally hit the police officer. In addition, according to statements by her attorney at sentencing, medical evidence existed which might have assisted appellant's defense that her actions while striking the police officer were involuntary. By entering the no contest plea, that evidence would not be presented.
 {¶ 130} Appellant's continual insistence that she had not intentionally hit the police officer, her obvious lack of focus, and her often non-responsive answers to many of the court's significant questions, indicate that she did not, in fact, understand the effect of her no contest plea, i.e., that her doctor's testimony or evidence of her medical condition would not be considered by the court in determining her guilt or innocence. Therefore, we conclude that appellant's plea was not knowingly or intelligently made, and did not conform to either federal constitutional plea requirements or those provided under Crim R. 11.
 {¶ 131} Accordingly, appellant's first assignment of error is well-taken.
 {¶ 132} The judgment of the Wood County Court of Common Pleas is reversed and vacated. Appellee is ordered to pay the costs of this appeal pursuant to App.R. 24. Judgment for the clerk's expense incurred in preparation of the record, fees allowed by law, and the fee for filing the appeal is awarded to Wood County.
 JUDGMENT REVERSED. *Page 23 
A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. See, also, 6th Dist.Loc.App.R. 4.
Peter M. Handwork, J., Mark L. Pietrykowski, P.J., William J. Skow, J., CONCUR. *Page 1