OPINION
{¶ 1} This matter is before the Court on the Notice of Appeal of Venucci M. Estepp, filed May 9, 2006. On September 16, 2005, Estepp was indicted by a Miami County Grand Jury on one count of attempted rape, in violation of R.C. 2923.02(A)(1)-2907.02(A)(1)(b), a felony of the second degree, and eight counts of gross sexual imposition, in violation of R.C. *Page 2 
29007.05(A)(4), felonies of the third degree, in case number 2005 CR 442. Upon the State's motion, the trial court consolidated for trial the above matter with case number 2005 CR 529, in which Estepp faced one count of rape. On March 15, 2006, Estepp was found not guilty of attempted rape, not guilty of rape, and guilty of all eight counts of gross sexual imposition. On April 27, 2006, following a hearing pursuant to R.C. 2950, the trial court designated Estepp a sexual predator.
 {¶ 2} The victims herein, A.B. and L.B., are the daughters of Estepp's former girlfriend, Julie Sheplar. Sheplar and Estepp met in Dayton, Ohio, in September of 2001. Sometime between October and December of the same year, Estepp, Sheplar, A.B., L.B. and Sheplar's son moved into an apartment together in Piqua, Ohio. A.B. and L.B. were 11 and 12 years old at the time, and they shared a room. Sheplar's and Estepp's relationship did not last long, and Estepp moved out of the apartment in December of 2001, according to Estepp, and in February of 2002, according to Sheplar.
 {¶ 3} In February, 2005, some three years later, Sheplar found and read a journal that L.B. kept in her room. According to Sheplar, in one entry, L.B. wrote, "* * * nobody knows about me and Ghost but [A.B.]." Estepp's nickname was "Ghost." L.B. and A.B. were at their grandmother's home at the time, and Sheplar went there to inquire about the journal entry. The girls revealed information about Estepp that was sexual in nature.
 {¶ 4} Sheplar testified that on "at least five or more occasions," while Estepp still resided with her, that she awakened to find him in bed with her daughters. Sheplar testified that this situation made her "uncomfortable," and that she asked her daughters, "is anything going on." She stated that the girls did not acknowledge that anything improper occurred between *Page 3 
them and Estepp. After Estepp moved out of the apartment in approximately 2002, Sheplar asserted that she had more discussions with her daughters about Estepp's behavior, "because I always had a gut feeling that something went on. * * * I asked them, * * *, I couldn't get anything out of them."
 {¶ 5} A.B. testified that Estepp often came into her room with a blanket and pillow and slept on the floor until Sheplar went to bed. Estepp told A.B. that the bed in Sheplar's room hurt his back. After Sheplar went to bed, A.B. stated that Estepp would get into her bed and touch her breasts and vagina. Neither she nor Estepp spoke to each other during these encounters. A.B. stated that this occurred more than 10 times. She stated that she never saw Estepp in bed with L.B. A.B. stated she was scared of Estepp. A.B. also stated that she did not think Sheplar ever asked her if anything was going on between her and Estepp. In 2005, A.B. wrote a statement for the police that provides, "Every night for almost a year `Ghost' would sleep in our room and sleep in our beds. He would force me to lay their [sic] while he touched and rubbed my breast and my vagina."
 {¶ 6} L.B. testified that Estepp would enter her room and "would either get in the bed with my sister or the bed with me or he'd lay on the floor." L.B. did not see Estepp do anything with A.B. other than get in bed with her. L.B. stated that she did not push Estepp away, she would "just ask him what he was doing and then he'd tell me he was dreaming and I'd just go back to sleep." L.B. testified that Estepp slept in her bed every other night for five months. L.B. stated that she did not tell Sheplar, and further testified she was not afraid of Estepp until after he allegedly raped her. L.B. testified that Sheplar never expressed any concern about Estepp's behavior to her. L.B.'s statement to the police provides, "I woke up in the middle of the night to *Page 4 
him rubbing my breasts and private area! I paniced [sic] and asked what in the heck was he doing, as I got his hands off of me! He simply told me he'd been dreaming. So I thought nothing of it. Until it happened again and again and again for the 5 months we lived there. I know it sounds retarded, but hey! I was 11 and gullable [sic]."
 {¶ 7} After Estepp and Sheplar's relationship ended, A.B. and L.B. continued to see Estepp in 2002 and 2003, going shopping and out to eat. They spent weekends at Estepp's home with his new girlfriend, Crystal Fiteze. Fiteze testified that the girls saw Estepp as a father-figure and were not afraid of him. Estepp introduced a letter he received from L.B., dated April 27, 2002, that begins, "Hey Daddy," and provides, "I luv u very much." Estepp also introduced a birthday card he received from A.B., dated March 13, 2002, that begins, "To Daddy" and ends, "Love always." Fiteze also testified that she and Estepp ran into Sheplar at a party in June or July of 2005, and that Sheplar told Estepp she wanted to get back together with him, but Estepp told Sheplar he would not leave Fiteze.
 {¶ 8} Estepp asserts three assignments of error. Our analysis of Estepp's second assignment of error renders analysis of the remaining assignments of error moot.
 {¶ 9} Estepp's second assignment of error is as follows:
 {¶ 10} "THE TRIAL COURT COMMITTED PLAIN ERROR WHEN IT DID NOT DECLARE A MISTRIAL OR ISSUE A CURATIVE INSTRUCTION SUA SPONTE AFTER THE PROSECUTOR ELICITED TESTIMONY REGARDING APPELLANT'S PRE-ARREST SILENCE."
 {¶ 11} "(1) [Admitting evidence of pre-arrest silence substantially impairs the policies behind the privilege against self-incrimination; and (2) the government's use of pre-arrest *Page 5 
silence in its case-in-chief is not a legitimate governmental practice."State v. Leach, 102 Ohio St.3d 135, 807 N.E.2d 335, 2004-Ohio-2147
(affirming judgment of appellate court reversing and remanding for new trial where the State had no physical evidence against Leach and relied solely on the credibility of its witnesses, and where the State used evidence, in its case-in-chief, of Leach's pre-arrest silence as substantive evidence of his guilt).
 {¶ 12} "The Supreme Court has held that the privilege against self-incrimination `reflects many of our fundamental values and most noble aspirations: our willingness to subject those suspected of crime to the cruel trilemma of self-accusation, perjury or contempt; our preference for an accusatorial rather than an inquisitorial system of criminal justice; our fear that self-incriminating statements will be elicited by inhumane treatment and abuses; our sense of fair play which dictates `a fair state-individual balance by requiring the government to leave the individual alone until good cause is shown for disturbing him and by requiring the government in its contest with the individual to shoulder the entire load; ` our respect for the inviolability of the human personality and of the right of each individual `to a private enclave where he may lead a private life; ` our distrust of self-deprecatory statements; and our realization that the privilege, while sometimes a `shelter to the guilty,' is often `a protection to the innocent.' (Internal citations omitted).
 {¶ 13} "Allowing the use of pre-arrest silence * * * as substantive evidence of guilt in the state's case-in-chief undermines the very protections the Fifth Amendment was designed to provide. To hold otherwise would encourage improper police tactics, as officers would have reason to delay administering Miranda warnings so that they might use the defendant's pre-arrest silence to encourage the jury to infer guilt. (Internal citation omitted). Use of pre-arrest *Page 6 
silence in the state's case-in-chief would force defendants either to permit the jury to infer guilt from their silence or surrender their right not to testify and take the stand to explain their prior silence.
 {¶ 14} "* * *
 {¶ 15} "[I]n the face of police questioning, the suspect might remain silent for innocent reasons: fear of police, threats from another person not to speak with police, embarrassment about a relationship or course of conduct that is not necessarily criminal, or the belief that explaining his or her conduct is futile. * * *
 {¶ 16} "We fail to see a reason to permit individuals to remain silent only when they have been specifically told by police of their right to do so. `We have also learned the companion lesson of history that no system of criminal justice can, or should, survive if it comes to depend for its continued effectiveness on the citizens' abdication through unawareness of their constitutional rights. * * * If the exercise of constitutional rights will thwart the effectiveness of a system of law enforcement, then there is something very wrong with that system.'
 {¶ 17} "* * *
[A]n accused's right to silence `is not derived from Miranda, but from the Fifth Amendment.' And the Miranda warnings themselves indicate that the right to silence exists prior to the time the government must advise the person of such right, i.e., you have the right to remain silent." Id. (Internal citation omitted).
 {¶ 18} Detective Jim Taylor of the Piqua Police Department testified for the State of Ohio regarding his investigation of A.B.'s and L.B.'s allegations against Estepp. Taylor *Page 7 
testified as follows:
 {¶ 19} "A. I believe on July 8th I received the first telephone call of several from the Defendant.
 {¶ 20} "* * *
 {¶ 21} "A. I informed him of the allegations against him which he denied and then we set about trying to make arrangements for him to come on station for an interview.
 {¶ 22} "Q. Okay. And did you ever interview him?
 {¶ 23} "A. No.
 {¶ 24} "* * *
 {¶ 25} "Q. Okay. Did you ever talk to the Defendant then about these charges?
 {¶ 26} "A. Like I say there were numerous phone calls over this period of time. We would attempt to make appointments for interviews which either he would cancel or he would have other issues that he couldn't make the interview. Um, at that point in, uh, I believe in July the case was brought before your office for a grand jury review.
 {¶ 27} "Q. My question is, did you talk to him about the charges?
 {¶ 28} "A. Yes.
 {¶ 29} "Q. All right. That's what I want to know.
 {¶ 30} "A. Um, actually the last phone call I got from the Defendant was after indictments had been issued and I explained to him that indictments were issued and that a warrant had been issued."
 {¶ 31} Estepp did not object to the above exchange. "Plain error or defects affecting substantial rights may be noticed although they were not brought to the attention of the court." *Page 8 
Crim.R. 52(B). "The power to notice plain error is discretionary. (Internal citations omitted). Plain error does not exist unless it can be said that but for the error, the outcome of the trial clearly would have been otherwise." State v. Hayes, Montgomery App. No. 21577,2007-Ohio-2101. "The plain error rule should be applied with caution and should be invoked only to avoid a clear miscarriage of justice."State v. Long (1978), 53 Ohio St.2d 91, 95-96, 372 N.E.2d 804.
 {¶ 32} As did the Ohio Supreme Court in Leach, we "conclude that the state's substantive use of the defendant's pre-arrest,pre-Miranda silence substantially subverts the policies behind the Fifth Amendment privilege against self-incrimination and is not a legitimate governmental practice." Leach. As in Leach, the State herein relied solely on the credibility of its witnesses. The only evidence against Estepp was the testimony of Sheplar's daughters; no physical evidence was presented. There are numerous inconsistencies in the testimony of A.B. and L.B. For example, A.B.'s statement to the police provided that Estepp slept in A.B.'s or LB.'s bed every night for almost a year while Estepp and Sheplar resided together, but Estepp lived with Sheplar for at most five months. There was no expert testimony presented by the State that the girls' behavior during and after the abuse was consistent with that of other victims of childhood sexual abuse. The prosecutor conceded at closing argument that "Julie Sheplar is not gonna win any awards for mother of the year," and that "these kids may not have been all that endearing. They're a product of their environment." From the adduced testimony on direct in the State's case-in-chief, that Estepp never discussed the allegations against him with Detective Taylor until after the indictments and warrant were issued, the jury could easily infer that Estepp deliberately eluded the investigation, missing appointments, because he was guilty. Since the evidence of Estepp's guilt was not overwhelming, the admission of his pre-arrest, pre- *Page 9 Miranda silence clearly could have altered the outcome of the trial. On this record, we find plain error. The judgment of the trial court is reversed and the matter is remanded for a new trial.
 WOLFF, P.J. and FAIN, J., concur. *Page 1