The STATE of Ohio, Appellee,

v.

ALLEN, Appellant.

[Cite as State v. Allen, 190 Ohio App.3d 240, 2010-Ohio-3999.]

Court of Appeals of Ohio,
Eighth District, Cuyahoga County.

No. 93372.

Decided Aug. 26, 2010.

---

2. In light of this holding, relators' April 26, 2010 motion to add the city of Springfield as a respondent is overruled.

William D. Mason, Cuyahoga County Prosecuting Attorney, and Katherine Mullin, Assistant Prosecuting Attorney, for appellee.

Susan J. Moran, for appellant.

MARY J. BOYLE, Judge.

{¶ 1} Defendant-appellant, Aaron Allen, appeals his convictions and sentence. He raises three assignment of error for our review:

{¶ 2} "[1.] Prosecutorial misconduct deprived appellant of his constitutionally guaranteed right to a fair trial, in violation of the Fifth and Fourteenth Amendments, to the United States Constitution and Section 10, Article I of the Ohio Constitution.

{¶ 3} "[2.] Appellant's conviction is against the manifest weight of the evidence.

{¶ 4} "[3.] The trial court erred in merging appellant's sentences for possessing, transporting, and selling a single quantity of crack cocaine in violation of the provisions within R.C. 2941.25, the protections of the Double Jeopardy Clause of the Fifth Amendment to the Constitution of the United States and Section 10, Article I of the Ohio Constitution."

{¶ 5} Finding merit to Allen's third assignment of error, we affirm in part, reverse in part, and remand for resentencing.

## Procedural History and Factual Background

{¶ 6} The grand jury indicted Allen on one count of drug trafficking in violation of R.C. 2925.03(A)(1), one count of drug trafficking in violation of R.C. 2925.03(A)(2), one count of drug possession in violation of R.C. 2925.11(A), and one count of possession of criminal tools in violation of R.C. 2923.24(A). The drug-trafficking and drug-possession charges also had major-drug-offender specifications attached. The case proceeded to a jury trial, where the following evidence was presented.

{¶ 7} Detective Scott Moran testified that he learned from Detective James Cudo that a "confidential reliable informant" was going to purchase an eighth of a kilogram of crack cocaine from a man named "Boobie" or "Aaron." Detective Moran further learned from Detective Cudo that the suspect would be wearing "a black hooded sweatshirt with lettering on the front and blue jeans, and he was a male approximately six foot tall."

{¶ 8} Detective Moran's role in the investigation was "surveillance for the transaction," which took place at Sbanos bar located at 7017 Superior Avenue. From his position east of the bar, Detective Moran observed a male wearing a black, hooded sweatshirt with white lettering and matching the suspect's description come out of the bar, talk on his cell phone, and then go back inside the bar. Approximately 20 minutes later, a black Chevy Tahoe arrived. The suspect came out of the bar and entered the passenger side of the Tahoe. A few minutes later, the suspect got out of the Tahoe and went inside the bar. The Tahoe then left the bar.

{¶ 9} Detective Leland Edwards followed the Tahoe. He explained that the Tahoe stopped at a house and a male got out of the driver's side and went in the house. A short time later, the man came back out, got into the Tahoe, and drove away. Detective Edwards said that he recognized the driver as Jermaine Bridges because he had a previous experience with him selling crack cocaine.

{¶ 10} Detective Moran saw the Tahoe return to the bar approximately 25 minutes later. The suspect came out of Sbanos again, went to the driver's side of the Tahoe, stood there briefly, and then went back inside the bar. A short time after that, Detective Moran learned from Detective Cudo that the drug buy had been completed.

{¶ 11} Detective Cudo later ran a global alias search on the name of "Boobie" and obtained Allen's name from the search. He then obtained Allen's photo from the Ohio Bureau of Motor Vehicles. He showed Allen's photo to Detective Moran, who identified Allen as the male he had seen going in and out of the bar.

{¶ 12} The confidential informant, Sumara, testified to several past felony convictions, including theft and passing bad checks. She stated that she had purchased Sbanos in September 2007; Carlton Story was her business partner at that time. Due to the high-crime area, she hired three Cleveland police officers to work security for her. She also set up 32 cameras inside and outside the bar.

{¶ 13} She explained that she first met Allen in 2007, when she opened the bar. He ran the upstairs bar and paid her rent to do so. She further stated that Allen's cousins, who are referred to as "the twins," "work with [Allen] up in the club."

{¶ 14} Sumara became a confidential informant when one of the security officers introduced her to Detective Cudo. Sumara testified that she asked Allen, who also went by the name of "Boobie," if she could buy drugs from him. He told her that she could and asked her what she needed. She told him that she needed "an eighth" of crack. Before the transaction, Sumara met with Detective Cudo, who placed a wire on her, gave her $3,600 of buy money, and instructed her on what to do.

{¶ 15} Sumara stated that the transaction took place in her private office, which is equipped with a video camera. She explained that at first Allen brought her only "a small amount of crack cocaine and * * * [she] knew from the amount of money that [she] had, which was $3600, the small package that he had given [her] didn't add up." Sumara then told Allen that she wanted "an eighth, a big one," and "he went and got it for [her]." After the transaction was complete, Sumara went directly to Detective Cudo to give him the drugs, the wire, and the remaining $100 because Allen only charged her $3,500 for the drugs.

{¶ 16} The state played the video, which had no sound, to the jury, and then played the audio. Sumara explained events as they unfolded on each device. She explained that the video showed two people walking into her office; she identified the two people as herself and "Aaron" or "Boobie." The video shows that the male was wearing a black, hooded sweatshirt with writing on the front. She then identified Allen in court as the man in the video and the man known as

"Boobie." The video then shows her taking a scale out of her desk, and then the man leaves. Sumara said that was because she realized that he had brought her the wrong amount of cocaine. The man later returns to her office, she weighs the drugs, gives him the money, he counts it, and then he leaves.

{¶ 17} Sumara then described events that occurred on the audio while the recording was played to the jury. At one point, Sumara received a call from Detective Cudo. She told him that Allen was wearing a black "hoodie" with some writing on it and blue jeans, and she described him as a very dark man who was tall and very slender.

{¶ 18} The two separate times that Allen came into Sumara's office, first with the wrong amount of drugs and then with the correct amount, can be clearly heard on the audio as Sumara described, although she does not say his name.[1] When he brought her the correct amount of cocaine the second time, Sumara is on the phone with someone as he walked into her office. She states to the person on the phone: "Let me talk to the twin, he just came into the office." Sumara explained that it was actually Allen who had come into her office, not "the twin." When asked why she said "the twin," she stated: "Because we had a discrepancy in the club the night before. So I wanted to talk to the twin, but also wanted to talk to Aaron also to find out what had went on the night before." Later, a loud knock is heard at the door; it was Carlton. Sumara is heard saying "Let me talk to the twin first." The state asked her again, "Why didn't you say, give me a minute, I'm talking to Boobie, or give me a minute, I'm talking to Aaron?" Sumara replied that Carlton was jealous of Allen and did not like him.

{¶ 19} Several days after the transaction, the officers went back to Jermaine Bridges's home and executed a search warrant. Detective Leland explained that Bridges was arrested in the Tahoe with 500 grams of crack cocaine.

{¶ 20} Detective Cudo and his partner, Detective Edwin Cuadra, also testified and corroborated the other witnesses' testimony. Detective Cuadra admitted on cross-examination that the video is not detailed enough to see the face of the man who sold Sumara the drugs. Detective Cudo said that when he saw the black Tahoe pull up to the bar, he immediately recognized it as Jermaine Bridges's vehicle. He explained that he had had an ongoing drug-trafficking investigation

---

1. We note, however, she does not say his name while he is in her office. As the man is leaving her office the first time (to get more cocaine), she is heard saying "Boo, listen to me." She says his name louder than her normal voice, as if he had already walked away from her. She then discusses something about a register key with "Boo." It sounds like the same person who was just in her office. But it is not clear, and this court will not speculate. It sounds like she opened the door to her office, and it is possible that "Boo" was standing outside her office and was not the same person who had just brought her the wrong amount of drugs.

for several years, with Bridges being the target, but denied that Bridges was the target on the evening of the controlled buy.

{¶ 21} Robert Burton testified for Allen. Burton said that he had been the owner of the bar and property where the controlled drug transaction took place since 1970 but that Carlton Story, his son-in-law, now owned the building.

{¶ 22} The jury found Allen guilty of both counts of drug trafficking and drug possession, as well as the major-drug-offender specifications, but found him not guilty of possessing criminal tools. The trial court merged all counts for purposes of sentencing, sentenced Allen to ten years in prison, and ordered that the sentence be served consecutively to any federal prison term. The trial court further ordered that Allen pay a $10,000 mandatory drug fine. Five years of postrelease control was also part of his sentence.

## Prosecutorial Misconduct

{¶ 23} In his first assignment of error, Allen claims that the prosecutor's misconduct throughout the trial and during closing arguments deprived him of a fair trial in violation of his constitutional rights. He claims that he is entitled to a new trial because (1) the prosecutor sought to elicit improper testimony from Detective Cudo, violating the Fifth Amendment, (2) the prosecutor improperly vouched for one of her witnesses during closing arguments, (3) the prosecutor repeatedly disparaged defense counsel, and (4) the cumulative effect of the prosecutor's misconduct deprived him of a fair trial.

{¶ 24} The standard of review for prosecutorial misconduct is whether the comments and questions by the prosecution were improper and, if so, whether they prejudiced appellant's substantial rights. *State v. Treesh* (2001), 90 Ohio St.3d 460, 480, 739 N.E.2d 749. Prosecutorial misconduct will not provide a basis for reversal unless the misconduct can be said to have deprived the appellant of a fair trial based on the entire record. *State v. Lott* (1990), 51 Ohio St.3d 160, 166, 555 N.E.2d 293. "The touchstone of analysis 'is the fairness of the trial, not the culpability of the prosecutor.'" *State v. Gapen*, 104 Ohio St.3d 358, 2004-Ohio-6548, 819 N.E.2d 1047, quoting *Smith v. Phillips* (1982), 455 U.S. 209, 219, 102 S.Ct. 940, 71 L.Ed.2d 78.

### A. *Fifth Amendment Privilege Against Self–Incrimination*

{¶ 25} The first issue Allen raises regarding the prosecutor's alleged misconduct occurred during the direct examination of Detective Cudo. Detective Cudo explained that before Allen's arrest, he had gone to his house to talk to him. The prosecutor asked him why, and he replied:

{¶ 26} "I asked if I could speak with him in private. He invited me into the house, Detective Negron into the house. We sat at his dining room table at which time I informed him that on April 10th we had bought 136 grams of crack from him. I informed him of the name of the person who bought the crack from him. I informed him that it was on video and audio.

{¶ 27} "I then informed him that I have an arrest warrant in my hand, but I did not intend to file it that day. My intentions that day were to inform him of the situation against him to see if he would be interested in cooperating with us to move our investigation on to other drug traffickers.

{¶ 28} "I told him I wanted him to go get an attorney and I wanted him to have the attorney call me and I would let the attorney see the video and the audio of the sale to assist them in making a decision with regards to his cooperation or not his cooperation. I then gave him my cellular phone number and we left the house at that time."

{¶ 29} The prosecutor then asked Detective Cudo if he received a call later that day. Detective Cudo replied that he did receive a call from Allen's defense counsel. The prosecutor then asked, "Did he decline the offer?" At that point, Allen's defense counsel objected and moved for a mistrial, which the trial court denied.

{¶ 30} Allen argues that the prosecutor violated his Fifth Amendment rights when she elicited this testimony because it implied that his "silence and inaction constitute an admission or example of guilt." We disagree.

{¶ 31} The Fifth Amendment to the United States Constitution provides that no person "shall be compelled in any criminal case to be a witness against himself." The protections of the Fifth Amendment apply to the states through the Fourteenth Amendment. *State v. Leach,* 102 Ohio St.3d 135, 2004-Ohio-2147, 807 N.E.2d 335, citing *Malloy v. Hogan* (1964), 378 U.S. 1, 6, 84 S.Ct. 1489, 12 L.Ed.2d 653.

{¶ 32} In *State v. Leach,* 102 Ohio St.3d 135, 2004-Ohio-2147, 807 N.E.2d 335, the Ohio Supreme Court held that the state's "[u]se of a defendant's pre-arrest silence as substantive evidence of guilt [as opposed to its use for impeachment purposes] violates the Fifth Amendment privilege against self-incrimination." Id. at the syllabus.

{¶ 33} In *Leach,* during the state's case in chief, a police officer testified that he had contacted the defendant and told him he wanted to talk to him about events that had occurred on a certain night. The defendant agreed, a time was set up for the next day, but the defendant did not show up for the appointment. Instead, the defendant left a message on the officer's phone that he wanted to speak with an attorney before talking to police.

{¶ 34} In finding that the state had violated Leach's Fifth Amendment rights, the Ohio Supreme Court explained:

{¶ 35} "The state in this case presented testimony that Leach, who had not yet been arrested or *Mirandized,* remained silent and/or asserted his right to counsel in the face of questioning by law enforcement. This testimony was clearly meant to allow the jury to infer Leach's guilt. Otherwise, jurors might reason, Leach would have offered his version of events to law enforcement." Id. at ¶ 25.

{¶ 36} We find that the facts in this case are distinguishable from those in *Leach.* Here, Detective Cudo did not ask Allen any questions about the case. Allen, in turn, did not refuse to talk to Detective Cudo. Detective Cudo just advised Allen to call his attorney to view the evidence against him. This is simply not a case in which the jury heard that a police officer attempted to set up interviews with the defendant to discuss allegations against him or her and then the defendant failed to show for the appointments with the officer. See *State v. Estepp,* 2d Dist. No. 2006CA22, 2007-Ohio-2596, 2007 WL 1536908 (defendant's Fifth Amendment rights were violated because "the jury could easily infer that [the defendant] deliberately eluded the investigation, missing appointments, because he was guilty").

{¶ 37} We therefore do not find that the prosecutor's conduct in this instance to be improper.

B. *Vouching for Witness*

{¶ 38} Allen next contends that during her closing argument, the prosecutor committed misconduct by improperly vouching for her witness, Sumara, and disparaging defense counsel.

{¶ 39} Regarding whether Allen's identity was established, the prosecutor stated: "A lot of this has to do with whether or not you believe Sumara. *We believe Sumara.* But you don't have to rely only on Sumara. You have the conversation but you have the video and you'll be able to look at it." (Emphasis added.)

{¶ 40} Allen failed to object at trial to this comment, and as a result, he must demonstrate that the error rises to the level of plain error. Crim.R. 52(B); *State v. Slagle* (1992), 65 Ohio St.3d 597, 604, 605 N.E.2d 916. The standard for plain-error reversal, however, is the same for reversal for prosecutorial misconduct, that is, whether the accused's substantial rights are so adversely affected as to undermine the fairness of the guilt-determining process. *State v. Swanson* (1984), 16 Ohio App.3d 375, 377, 16 OBR 430, 476 N.E.2d 672.

{¶ 41} We agree that prosecutor committed misconduct by improperly expressing her personal belief regarding the credibility of Sumara. See *State v.*

*Smith* (1984), 14 Ohio St.3d 13, 14, 14 OBR 317, 470 N.E.2d 883; *State v. McDade* (June 26, 1998), 11th Dist. No. 96–L–197, 1998 WL 553016. It is the jury's duty to determine who was being truthful and to decide what inferences could be drawn from Sumara's testimony and from the audio and video. *State v. Boston* (1989), 46 Ohio St.3d 108, 129, 545 N.E.2d 1220.

■ {¶ 42} Our focus upon review, however, is whether the prosecutor's comment deprived Allen of a fair trial so that there is a reasonable probability that but for the prosecutor's misconduct, the result of the proceeding would have been different. *State v. Loza* (1994), 71 Ohio St.3d 61, 78–79, 641 N.E.2d 1082, overruled on other grounds. And in this instance, we do not believe that the prosecutor's improper vouching affected the outcome of the trial. We have reviewed the prosecutor's entire closing argument and have found that the prosecutor reminded the jury a number of times to evaluate all of the evidence presented and decide for themselves if it was Allen who sold Sumara the drugs.

### C. *Denigration of Defense Counsel*

{¶ 43} Allen next contends that several comments made by the prosecutor were derogatory toward defense counsel and deprived him of a fair trial.

{¶ 44} We look with disfavor on remarks that denigrate defense counsel for doing his or her job and thereby denigrate the defendant. *State v. Keenan* (1993), 66 Ohio St.3d 402, 405–406, 613 N.E.2d 203.

■ {¶ 45} Allen complains of the following comments made by the prosecutor:

{¶ 46} (1) "You know, I know she's my witness, but I'm telling you, use your own common sense, was she lying to you? * * * She was grilled for an hour and 45 minutes, nearly to two hours, *standing in front of somebody and repeatedly asking the same leading questions with false premises over and over and over and over again. That's not cross-examination.*"[2]

{¶ 47} (2) "So what exactly is [defense counsel] arguing? She's all over the board. You want to know why, *she's trying to shove a square peg into a round hole.*"

{¶ 48} (3) "*There is a reason why arguments by defense counsel are not supposed to be taken as evidence. Because you want to know what, we try to twist things up and make you accept our beliefs.*"

{¶ 49} (4) "Thank goodness for defense attorneys because they always know exactly how police should do their work."

---

2. This was the only comment defense counsel objected to, and the objection was overruled by the trial court.

{¶ 50} (5) "There's nothing so far in their rendition of what they want you to believe that makes any sense in logic or reason. They have to rely on the twin argument because she references twin in the audio."

{¶ 51} (6) *"That's another example of her trying to mix it up and confuse you,* Brew, Boo, Boobie, like its some big mystery." (Emphasis added as in Allen's brief.)

{¶ 52} We agree that some of the prosecutor's comments here push the boundaries of acceptable prosecutorial conduct. Nonetheless, we do not find the comments as egregious or numerous as the statements at issue in *Keenan,* 66 Ohio St.3d 402, 613 N.E.2d 203. In *Keenan,* the Ohio Supreme Court reversed a defendant's conviction for aggravated murder due to the prosecutor's shockingly prejudicial comments during closing argument. It was abundantly clear in *Keenan,* however, that the prosecutor's argument was carefully drafted to denigrate the defendant and his counsel and appeal to the emotions of the jury, rather than to aid the jury by presenting a summation of the evidence supporting the state's case. The *Keenan* court found that the prosecutor's misconduct was "a textbook example of what a closing argument should not be." Id. at 410, citing *State v. Liberatore* (1982), 69 Ohio St.2d 583, 589, 23 O.O.3d 489, 433 N.E.2d 561. We simply do not have that here.

{¶ 53} Accordingly, we find no deprivation of Allen's right to a fair trial.

D. *Cumulative Effect of Prosecutor's Misconduct*

{¶ 54} Finally, Allen maintains that the cumulative effect of the prosecutor's conduct deprived him of a fair trial because the prosecutor "deliberately saturate[d] the trial with emotion." Allen cites *Keenan* in support of this argument.

{¶ 55} In *Keenan,* the Ohio Supreme Court explained:

{¶ 56} "[W]e have consistently held the prosecution entitled to 'some latitude and freedom of expression' in summation. *State v. Woodards* (1966), 6 Ohio St.2d 14, 26, 35 O.O.2d 8, 215 N.E.2d 568, 578. Realism compels us to recognize that criminal trials cannot be squeezed dry of all feeling.

{¶ 57} "But it does not follow that prosecutors may deliberately saturate trials with emotion. We have previously announced that 'a conviction based solely on the inflammation of fears and passions, rather than proof of guilt, requires reversal.' *State v. Williams* (1986), 23 Ohio St.3d 16, 20, 23 OBR 13, 17, 490 N.E.2d 906, 911. Excessively emotional arguments may deny due process." *Keenan* at 409, 613 N.E.2d 203.

{¶ 58} After reviewing the entire record, we do not agree with Allen that the prosecutor saturated the trial with emotion at all—let alone so that it deprived

him of a fair trial. Again, the prosecutor's comments in this case are nothing like those made by the prosecutor in *Keenan* (the prosecutor's entire closing argument "consistently substituted emotion for reasoned advocacy" and "[h]e expressly encouraged the jury to react emotionally to the evidence"). Id. at 407.

{¶ 59} Allen's first assignment of error is overruled.

### Manifest Weight of the Evidence

{¶ 60} In his second assignment of error, Allen maintains that his convictions are against the manifest weight of the evidence. We disagree.

{¶ 61} In reviewing a claim challenging the manifest weight of the evidence, "[t]he question to be answered when a manifest-weight issue is raised is whether 'there is *substantial* evidence upon which a jury could reasonably conclude that all the elements have been proved beyond a reasonable doubt.' (Emphasis sic.) In conducting this review, we must examine the entire record, weigh the evidence and all reasonable inferences, consider the credibility of the witnesses, and determine whether the ' "jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." ' " (Citations omitted.) *State v. Leonard,* 104 Ohio St.3d 54, 2004-Ohio-6235, 818 N.E.2d 229, ¶ 81, quoting *State v. Getsy* (1998), 84 Ohio St.3d 180, 193–194, 702 N.E.2d 866, and *State v. Martin* (1983), 20 Ohio App.3d 172, 175, 20 OBR 215, 485 N.E.2d 717.

{¶ 62} Specifically, Allen argues that the state did not establish his identity. He contends that the state's evidence consisted of "self-serving lies from the confidential informant, [and] testimony from police officers who neither saw nor heard the sale occur in real time." Allen further contends that "the video surveillance evidence is of such poor value that even the investigating detectives acknowledge the lack of identification certainty," and he argues that the evidence established that the person who sold drugs to Sumara was either one of the twins or Jermaine Bridges.

{¶ 63} We do not agree with Allen that the jury lost its way in finding that he was the one who sold crack cocaine to Sumara. Despite not showing his face clearly, the video definitively shows that the man selling drugs to Sumara was wearing jeans and a black, hooded sweatshirt with white lettering. The jury also heard evidence that Sumara told Detective Cudo before the controlled drug transaction took place what Allen was wearing that day: jeans and a black sweatshirt with writing on the front.[3] And this is exactly what the man who

---

3. Allen contends that Sumara did not give a description of what he was wearing on the audio recording, that she just described his physical appearance. But this court has listened to the

came in and out of the bar, later identified by Detective Moran as Allen, was wearing.

{¶ 64} We do agree that it is odd that on the audio recording Sumara twice states that the "twin" was in her office, when she testified it was actually Allen in her office at that time. Nonetheless, we do not find that these two statements establish that the jury lost its way—especially in light of all of the other evidence against him.

{¶ 65} After reviewing the entire record, we find that Allen's convictions were not contrary to the manifest weight of the evidence, and we overrule his second assignment of error.

### Allied Offenses

{¶ 66} In his third assignment of error, Allen argues that the trial court erred when it sentenced him on all three convictions because they were allied offenses of similar import. We agree the trial court erred, but for different reasons.

{¶ 67} Allen was convicted of drug trafficking in violation of R.C. 2925.03(A)(1), drug trafficking in violation of R.C. 2925.03(A)(2), and drug possession in violation of R.C. 2925.11(A). The trial court merged all three for purposes of sentencing and sentenced Allen to ten years in prison, which was the minimum mandatory sentence.

{¶ 68} In *State v. Cabrales*, 118 Ohio St.3d 54, 2008-Ohio-1625, 886 N.E.2d 181, the Ohio Supreme Court held that possession under R.C. 2925.11(A) (the offender must knowingly obtain, possess, or use a controlled substance) and trafficking under R.C. 2925.03(A)(1) (the offender must knowingly sell or offer to sell a controlled substance) are not allied offenses of similar import. But it held that trafficking under R.C. 2925.03(A)(2) (the offender must knowingly prepare for shipment, ship, transport, deliver, prepare for distribution, or distribute a controlled substance, knowing, or having reason to know, that the substance is intended for sale) and possession are allied offenses.

{¶ 69} Thus, the trial court erred when it merged all three offenses. It should have merged only drug trafficking under R.C. 2925.03(A)(2) and possession. Although it is not a mystery which offense the state will elect, trafficking or possession, it retains the right to do so. We therefore reverse Allen's sentence and remand for resentencing. See *State v. Whitfield*, 124 Ohio St.3d 319, 2010-Ohio-2, 922 N.E.2d 182, paragraph two of the syllabus (appellate courts "must

---

audio. One can clearly hear Sumara describe exactly what Allen was wearing that evening to Detective Cudo while she was talking to him on the phone.

reverse the judgment of conviction and remand for a new sentencing hearing at which the state must elect which allied offense it will pursue against the defendant").

{¶ 70} Allen's third assignment of error is sustained.

{¶ 71} The judgment is affirmed in part and reversed in part, and the cause is remanded for further proceedings consistent with this opinion.

Judgment affirmed in part<br>
and reversed in part,<br>
and cause remanded.

JONES, J., concurs.

GALLAGHER, A.J., concurs but concurs in judgment only with respect to Section C, "Denigration of Defense Counsel."